JAMES L. DAY, WSBA #20474   HONORABLE WHITMAN L. HOLT
JASON WAX, WSBA #41944
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101-2373
Tel: (206) 292-2110
Emails: jday@bskd.com;
jwax@bskd.com

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| In re | Chapter 9 |
|---|---|
| CITY OF CLE ELUM, | No. 25-01128-WLH |
| Debtor. | RESPONSE TO DEBTOR'S PROPOSED DEADLINES |

City Heights Holdings, LLC ("City Heights"), the holder of a judgment against debtor City of Cle Elum (the "Debtor") totaling more than $25 million, hereby responds to the Debtor's motion for an order setting various deadlines, and to also provide the court with a more objectively accurate description of the Debtor's current circumstances.

**A.   Summary of Case**

This two-party dispute arises out of the Debtor's years-long refusal to comply with a development agreement it entered into with City Heights, resulting in significant damages to and, ultimately, a judgment in favor of City Heights; and the Debtor's decision to file this case mere days following a continued mediation at which the

RESPONSE TO DEBTOR'S PROPOSED DEADLINES–
Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

25-01128-WLH9   Doc 17   Filed 07/02/25   Entered 07/02/25 10:32:14   Pg 1 of 20

parties were close enough to a comprehensive settlement that the mediator prepared and circulated a draft agreement. This was the last of several mediation sessions with mediator Al Smith, who worked tirelessly to get the parties to closure and had the parties at settlement's doorstep. The Debtor now seeks this court's assistance in avoiding the consequences of its affirmative violations of the development agreement and its abrupt choice to file this case.

The Debtor therefore presents itself to this court as perhaps the least sympathetic debtor to have ever filed a chapter 9 case. As the court will learn, this is not a municipal debtor struggling with the financial challenges of declining populations and revenues, aging infrastructure, out-of-control pension plan obligations, or other burdens largely outside the city's control. Rather, the Debtor's financial issues were wholly self-inflicted and completely preventable. The Debtor affirmatively chose to serially breach the development agreement over a period of years – even after an arbitrator directed the Debtor to comply with the agreement *twice* – before judgment was entered following a third arbitration.

But rather than having to choose between the historical narratives of the Debtor or City Heights, the court is urged to read the November 5, 2024, ruling of arbitrator Judge Paris K. Kallas (retired), a complete copy of which is attached hereto as <u>Exhibit A</u>. Following nine days of proceedings, Judge Kallas entered an award in favor of City Heights, determining that City Heights "soundly meets its burden of proving that the City persistently breached the Development Agreement." *See* Exh. A at 2. Judge Kallas makes it clear that the Debtor has no one to blame but itself:

RESPONSE TO DEBTOR'S PROPOSED DEADLINES–
Page 2

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 2 of 20

> Also significant, however, is the fact that the City had numerous opportunities since 2019 to reduce the damage caused by its dissatisfaction with the Development Agreement. This is the **third arbitration** between the parties. In both prior arbitrations, the City's interpretation of the Development Agreement was soundly rejected. Rather than change course and become the cooperative partner contemplated by the Development Agreement, the City publicly stated its dissatisfaction with the contract and the City continued its persistent breach of the contract.

See Exh. A at 3 (emphasis in original).

Having been the sole author of its financial challenges, it now seeks relief from the consequences of its bad behavior despite not being able to satisfy eligibility requirements. In particular, notwithstanding that the parties were on the cusp of a comprehensive settlement of both financial and land-use related issues just days prior to its filing of this case, the Debtor wholly abandoned that effort and rewarded City Heights for its patience (the arbitration award was entered back in November 2024) with the filing of this case. How the Debtor believes it can demonstrate that it has a genuine desire to effect a plan or that it negotiated in good faith prior to filing this case is completely absent from the record here.

City Heights presumes that the Debtor will now seek to double down on its lack of good faith by ultimately seeking to jettison the development agreement between the parties pursuant to section 365, in the hope that it can retain all the benefits of the agreement (including the earlier annexation of all the development property) while avoiding any perceived "burdens." The irony that the Debtor demanded annexation as a component of the development agreement, then serially breached that agreement and, having obtained all the benefits of the agreement will now seek to reject it, will be completely lost on the Debtor. In any case, as the court will eventually learn, section

RESPONSE TO DEBTOR'S PROPOSED DEADLINES–
Page 3

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 3 of 20

365 does not even apply to the statutorily-vested rights that City Heights holds. Even if it did, the Debtor will be unable to satisfy its requirements.

**B.	Parties Should Be Directed to Conclude Mediation**

Before the Debtor spends what it contends are extremely limited resources proceeding with this case, City Heights believes the best first move in this case would be to direct the parties back to mediation. As the Debtor would acknowledge, it is current with every other of its creditors and has not needed to, nor would it now need to, include any other parties to finalize a solution with City Heights. City Heights will be filing a motion seeking entry of such an order in the coming days.

**C.	Response to Relief Requested**

City Heights believes that the deadlines the Debtor requests for filing objections to the Debtor's eligibility (August 15) and for filing a plan (December 31) are both inappropriate. As the first, the Debtor's eligibility under at least three of the five requirements under section 109(c) will be fact-intensive. City Heights intends to do discovery to determine the full basis for its anticipated objection, and will need more than six weeks to obtain and analyze that discovery and prepare an objection. Depending on the Debtor's willingness to timely respond to discovery requests and appear for depositions, a more appropriate deadline for objections to eligibility is <u>October 31, 2025</u>.

On the other hand, there is no apparent basis for the Debtor's needing six months to file its initial plan and disclosure statement, as the Debtor should have been working on a plan already. The obligation imposed on a prospective chapter 9 debtor to negotiate with its creditors prior to filing requires that it actually propose plan terms,

RESPONSE TO DEBTOR'S PROPOSED DEADLINES–
Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 4 of 20

and not just claim poverty. "[W]hile a complete plan is not required, some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary." *Pierce County Housing Authority,* 414 B.R at 713, quoting *In re City of Vallejo,* 408 B.R. 280, 297 (9th Cir. BAP 2009). If the court directs the parties to return to mediation and that mediation is successful, a plan can be readily crafted from the terms of the parties' settlement. If unsuccessful, or the parties for whatever reason do not return to mediation, City Heights is the Debtor's sole creditor as to which the Debtor is not current on its obligations. Again, the Debtor can prepare a plan without the need to modify the terms of repayment of any other creditors.

DATED this 2nd day of July, 2025.

BUSH KORNFELD LLP


By  *James L. Day*
James L. Day (WSBA #20474)
Jason Wax (WSBA #41944)
Attorneys for City Heights Holdings, LLC

RESPONSE TO DEBTOR'S PROPOSED DEADLINES–
Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 5 of 20

# EXHIBIT A

Judicial Dispute Resolution, LLC

Charles S. Burdell, Jr.
John P. Erlick
George Finkle
Bruce Heller
Larry Jordan
Paris K. Kallas
Palmer Robinson
Steve Scott

November 5, 2024

Margaret Yvonne Archer
Ryan C Espegard
Gordon Thomas Honeywell LLP
1201 Pacific Ave Ste 2100
Tacoma, WA 98402-4314

Duana T. Koloušková
Dean Williams
Johns Monroe Mitsunaga Kolouskova PLLC
11201 SE 8th St Ste 120
Bellevue, WA 98004-6457

Alexandra Kenyon
Michael Kenyon
Kenyon Disend, PLLC
11 Front St S
Issaquah, WA 98027-3820

Kenneth W. Harper
Menke Jackson Beyer, LLP
807 N 39th Ave
Yakima, WA 98902-6389

Rebecca S. Ashbaugh
Brittney Silver Rivers
Ashbaugh Beal LLP
920 5th Avenue, Suite 3400
Seattle, WA 98104-7031

Re: City Heights Holdings, LLC v. City of Cle Elum

In November 2011, the City of Cle Elum (the City) and City Heights Holdings, LLC (CHH)[1] entered into a contract, formally titled *City Heights Annexation and Development Agreement* (hereinafter Development Agreement or contract). This contract authorizes a master planned community for approximately 950 homesites situated on 358 acres (the Project). In 2011, the parties understood that the housing market was slowly recovering from the 2008 financial crisis and that the market was not ready for the Project. Thus, the Development Agreement authorizes a 25-year buildout period and expressly grants CHH sole discretion to determine when market conditions are ready.

---

[1] The Ridge Entities, City Heights Holdings' predecessors, negotiated the Development Agreement. For ease of reference, the Ridge Entities are referred to herein as City Heights Holdings, LLC (City Heights).

1425 Fourth Avenue, Suite 300
Seattle, WA 98101
Phone: (206) 223-1669
www.jdrllc.com

In 2019, CHH first announced it was ready to begin development. This decision was made after careful and detailed study of the market. But the City, only eight years into the 25-year buildout period, expressed dissatisfaction with the Development Agreement, characterizing the contract as outdated, one-sided, and incomplete. The City sought to add new conditions to the contract and the City failed to follow the contract's bargained-for expedited permitting process.

The City's interpretation of the contact has led to protracted litigation. In two prior arbitrations, CHH successfully challenged the City's interpretation and application of the contract. Despite being ordered twice to comply with the expedited permitting process, the City maintained its dissatisfaction with the contract.

In this third arbitration, CHH alleges that the City has breached the Development Agreement and CHH seeks damages for the alleged breach. The arbitration hearing took place over nine days, beginning on September 30 and concluding on October 10, 2024. The parties submitted extensive testimony, numerous expert reports, and thousands of pages of exhibits. Counsel fully briefed the applicable law and presented argument.

Having considered the extensive evidence presented, the credibility of witnesses, the argument of counsel, and the governing law, I find that CHH soundly meets its burden of proving that the City persistently breached the Development Agreement. CHH also proves that the City's persistent breach significantly delayed the bargained-for expedited permitting process, thus depriving CHH of the benefits of the Development Agreement. Finally, CHH fully meets its burden of proving the damages caused by the City's breach.

The damage caused by the City's breach of the Development Agreement is significant. But for the City's breach, CHH would have been able to promote an exciting project in a thriving market- the market it was contractually entitled to select. CHH would have been able to market a development integrated with, rather than separate from, the City that would also include a club house, pool, Outfitters Building, and a string-of-pearls of parks and trails. Now, CHH has lost the confidence of builders and CHH must explain to potential consumers the years of protracted litigation with a City that has publicly obstructed the Project. CHH is left with significant debt, the absence of a club house, pool, or Outfitters Building. For all these reasons, the damage is significant.

City Heights Holdings, LLC v. City of Cle Elum
Page 2 of 12

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 8 of 20

Also significant, however, is the fact that the City had numerous opportunities since 2019 to reduce the damage caused by its dissatisfaction with the Development Agreement. This is the **third arbitration** between the parties. In both prior arbitrations, the City's interpretation of the Development Agreement was soundly rejected. Rather than change course and become the cooperative partner contemplated by the Development Agreement, the City publicly stated its dissatisfaction with the contract and the City continued its persistent breach of the contract.

At the parties' request, I submit this letter in addition to the Arbitration Award. It is not part of the Award. Rather, it provides a brief explanation of my reasoning for entry of this Arbitration Award.

**The Development and Annexation Agreement: an Extensive and Expensive Two-Plus Year Process that Included State Agencies and the Public and Resulted in Comprehensive Standards for the Project**

At the heart of this litigation is the Development and Annexation Agreement.[2] When considering the allegations in this arbitration, it must be remembered that the City, not CHH, initiated the concept of a development agreement and annexation. It was the City that pursued and ultimately persuaded CHH to enter into a development agreement.

As initially planned, the Project was located outside City limits. Thus, the City's land use and growth management ordinances did not apply and the Project would be governed only by the County's less restrictive regulations. Having learned some hard lessons regarding a different development, the City strongly desired the ability to control this Project and its impact. In this arbitration, it is undisputed that the most effective way to control the Project was to annex it. It is also undisputed that CHH was not receptive to annexation and it initially declined to pursue the concept. But the City persisted and ultimately persuaded CHH to explore the possibility.

Thus began a two-plus year extensive and expensive process that included consultants who studied matters such as critical areas, wetlands, environmental impact, hazards presented by coal

---

[2] A development agreement is a voluntary contract between a local government and a property owner. Development agreements are authorized by state statute and the City's own ordinances. RCW 36.70B.170 *et seq*. and CEMC 17.140. The State Legislature recognizes numerous public policy benefits that flow from development agreements, including reducing housing costs and efficient use of public resources. The Legislature notes that development agreements "strengthen the public planning process, encourage private participation and comprehensive planning, and reduce the economic costs of development." RCW 36.70B.170 (notes).

City Heights Holdings, LLC v. City of Cle Elum    Judicial Dispute Resolution LLC
Page 3 of 12                                      1425 Fourth Ave., Suite 300 Seattle, WA 98101
                                                  206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 9 of 20

mines, traffic, and stormwater systems. The study included state agencies, the Army Corps of Engineers, industry leaders, environmental specialists, and neighboring potentially impacted Sovereign Nations. The public was included and five separate public hearings were conducted. The potential impacts of the Project were fully explored through an Environmental Impact Statement (EIS). And CHH paid for all consultants retained for these years of study, including paying for the City's land use attorneys.

The result of this extensive process is the detailed Development Agreement (over 100 pages long) that imposes comprehensive development standards and conditions of approval on the Project. The numerous detailed appendices address matters such as land use types and density, road standards, transportation, public trails, parks, stormwater management, wildlife habitat, critical areas, coal mine hazard areas, and impact to City services.

In exchange for the exhaustive two-plus year review and the resulting comprehensive conditions, the Development Agreement sets forth an expedited administrative review process. It requires City staff to determine within 45 days of receiving a complete permit application whether the application is consistent with the contract's standards. If consistent, the parties agreed that no other review is allowed.

Given the breadth and depth of the conditions imposed, the Development Agreement provides that the Project "shall vest under the law and regulations in effect on the Vesting Date."[3] The Development Agreement further provides that "the City shall not modify or impose new or additional" conditions "beyond those set forth in this Agreement" unless needed to address a serious threat to public health or safety or to prevent violation of a state or federal law.[4]

The development standards, conditions of approval, and all other terms of the Development Agreement were unanimously approved by the City Council, following the five aforementioned public hearings.

When parties enter into a contract, they bargain for the respective benefits. Here, the City succeeded in its desire to annex and thus control the Project. This promoted the City's growth

---

[3] Development Agreement at Section 8.2.
[4] Development Agreement at Section 8.2.

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 10 of 20

management and planning goals contained in the City's 2007 Comprehensive Plan and Growth Management Act.[5]

CHH bargained for the benefit of front-loading all necessary study, which guaranteed a prompt and predictable permitting process once development was ready. The City's persistent breach of the Development Agreement has deprived CHH of its bargained-for benefits.

**The City's Breach of the Development Agreement**

As noted, the parties executed the Development Agreement in 2011. One of the contract's many material terms includes a 25-year buildout period; the parties expressly recognized that CHH would determine when market conditions were ripe for the Project.[6]

In 2019, CHH contacted the City, indicating it was ready to begin development. But the City, only eight years into the 25-year buildout period, found itself dissatisfied with what it deemed an outdated, one-sided, and incomplete contract.

Within weeks of the initial meeting with CHH, the City, through its designated Project Manager and Lead Planner (hereinafter City Project Manager), characterized the Development Agreement as unfair and "one-sided."[7] The Project Manager informed City staff that he intended to re-negotiate certain terms. His internal memo states: "The Development Agreement is very one sided as written, but it doesn't mean that we can't explore voluntary agreements that provide

---

[5] The Development Agreement, at Section 3.2 provides, in part, as follows: "The Master Site Plan for City Heights promotes growth management and planning objectives of the City of Cle Elum, as such obje[c]tives are contained in the City's 2007 Comprehensive Plan[.]"

[6] The Development Agreement, at Section 7, provides:
>    The parties acknowledge that the development of the Property depends on numerous factors, such as market orientation and demand, interest rates, and competition, and that the Ridge Entities are entitled ultimately to determine the extent and rate of development consistent with the Conditions of Approval. The Phasing of the Project is expressly provided to occur over the Buildout Period. The Ridge Entities may proceed with development of the Property according to whatever phasing or parcel development plan the Ridge Entities deem appropriate.

The Development Agreement, at Section 2, defines the *Buildout Period* as 25 years.

[7] Given the extent of the Project Manager's obstruction of the Development Agreement, it is tempting to lay the City's breach at his feet. The record is clear, however, that the City was fully aware of and endorsed the Project Manager's approach. One cannot, however, help but wonder why: the City had actual knowledge of the Project Manager's similar obstruction of a permitting process with a different developer and a different city. His obstruction resulted in protracted litigation in that case. There, a jury determined the Project Manager tortiously interfered with the development and the jury issued a $10 million verdict against that City. The 2005 jury verdict was affirmed on appeal. Adjusting the 2005 $10 million verdict to present day value, one can see the significant harm that flows when a City violates the applicable permitting process. *See Westmark Development Corporation v. City of Burien,* 140 Wash. App. 540 (2007).

City Heights Holdings, LLC v. City of Cle Elum
Page 5 of 12

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669 www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 11 of 20

otherwise." In this arbitration, CHH establishes that the "voluntary agreements" were no such thing. Rather, CHH establishes that the City used its permitting authority to renegotiate numerous contract terms, a concept expressly barred by the Development Agreement.

The first such "voluntary agreement" was the City's demand that CHH enter into a Cost Reimbursement Agreement before City staff would even begin to review the 100-page contract. As another example, the Development Agreement expressly contemplates the realignment of Summit View Drive. But when CHH submitted the proposed realignment, the City publicly stated that this provided a "little window of opportunity" to negotiate a new bargain in which CHH would bear responsibility to improve the Stafford Street Corridor in its entirety, a condition not imposed in the Development Agreement.

In addition to viewing the contract as one-sided and incomplete, the City expressed frustration that nearly eight years had passed since the Development Agreement was signed. The City Planner publicly described the Project as the "zombie project because it was dead and has come back to life to haunt us." The Project Manager opined that development agreements pose problems if the developer proceeds five or 10 years after approval. In direct violation of the 25-year buildout period and vested provisions, the Project Manager stated that the mere passage of time may require supplemental review of matters such as traffic and environmental impact.

Dissatisfied with the Development Agreement, the City failed to comply with numerous contractual terms, only some of which are noted above. At the heart of this arbitration is the City's breach of the expedited permitting process. Rather than follow the expedited permitting process, the City imposed a pre-application process, initiating the delay from the outset. Then the City asserted that it would review the Phase 1 Preliminary plat application under the City's Type IV process, a process specifically at odds with the process adopted in the Development Agreement. Next, the City failed to provide the necessary forms required for an expedited permitting process. Rather, the forms that CHH was directed to use did not comply with the contractual permitting process. Once the application was submitted, the City deemed it incomplete. But the City did not identify missing information. To the contrary, ignoring the Project's vested status, the City asserted that the Project did not comply with the 2020 City Code.

Despite the contract's plain language, the City adhered to its position that the Type IV process applied rather than the expedited permitting process set forth in the Development

City Heights Holdings, LLC v. City of Cle Elum    Judicial Dispute Resolution LLC
Page 6 of 12    1425 Fourth Ave., Suite 300 Seattle, WA 98101
    206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 12 of 20

Agreement. Acting on this interpretation, the City Project Manager sent a notice to various agencies and to the public soliciting comments. The notice failed to inform the agencies or the public that the City had contractually agreed that the solicitation process had already been conducted and that further review was expressly prohibited, except in limited circumstances. During this same time period, the City Project Manager actively interfered with CHH's efforts to commence development by seeking a Forest Practices Act permit. The record fully describes his misleading communication with the Department of Natural Resources (DNR) and his efforts to enlist the DNR's resistance to the requested Forest Practices Act permit.

The City defends its application of the Development Agreement, asserting that the parties merely interpreted the contract differently. The City contends its interpretation was in good faith and not intended to breach the Development Agreement. This is not credible given the numerous instances of disregarding the contract's plain language, coupled with numerous statements (internal and public) of dissatisfaction. Nor is the City Project Manager a credible witness. Moreover, the City's interpretation was rejected in the first arbitration, as described below.

Facing the City's refusal to comply with the bargained-for expedited permitting process, CHH initiated the first arbitration. CHH requested that the City be ordered to "comply with the DA's [Development Agreement] expedited review process" and that the City be barred "from mandating additional review or imposing new conditions on Approvals[.]" On November 16, 2020, I issued the first Arbitration Award granting CHH's request and ordering the City to comply with the contract terms.

The Arbitration Award provided the City with an opportunity to change course and to begin the cooperative partnership contemplated in the Development Agreement. The City failed to do so. Following the Award, the City should have immediately issued a final consistency review of the Phase I Preliminary Plat approval. Instead, the City issued a draft decision. Moreover, the draft decision violated the Development Agreement by including new terms and conditions, including the following: a critical areas report and mitigation plan (already performed under the EIS), creation of a master park plan, and new traffic studies. The City's continued dissatisfaction

City Heights Holdings, LLC v. City of Cle Elum
Page 7 of 12

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669 www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 13 of 20

with the Development Agreement resulted in extensive time and resources to negotiate a compromise to allow the Project to continue.[8]

The City's noncompliance extended to inaction on and piecemeal review of the Phase 1 Civil Engineering plans, including failure to provide Planning or Environmental comments to the completed application. CHH objected to the piecemeal review, specifically noting the failure to comply with the contract's process. CHH noted: "although the civil and construction plans have been in your possession for 212 days, we have not received any meaningful comment[."] CHH noted that the Development Agreement "envisions expedient review processes, not six months of silence." Despite this well-placed objection, the City waited another 6-plus weeks before approving the Final Engineering plans.

During this same time, the City breached its duties of good faith and fair dealing. Regarding its citizens, the City encouraged rather than calmed citizen frustration with the Project. The City failed to educate its citizens regarding the history of the Development Agreement, the extensive public review process already completed, and the numerous benefits to the City. To the contrary, in an email to the residents that was published in the local newspaper, the City Project Manager expressed his continued dissatisfaction with the contract. And at a public meeting with concerned residents, the City publicly mischaracterized (by stating public input and comment was prohibited) and denounced the Arbitration Award. Rather than set the record straight, the City encouraged those residents with financial resources to consider suing CHH. All of this occurred at a public meeting to which the City failed to invite or include CHH.

The City also breached its duties of good faith and fair dealing by contacting numerous agencies, without including CHH in the communications, and actively encouraging the agencies to challenge the Development Agreement, while affirmatively misrepresenting the contract's terms as well as CHH's interpretation of the contract. For example, the City Project Manager sent an email to the Department of Ecology (DOE):

> The Developer frequently tells us that they only have to do what is in the Development Agreement, and if we think something was missed, we should have brought it up when the DEIS [draft environmental impact statement] was circulated 11 years ago. That makes no

---

[8] The July 2021 Settlement Agreement and subsequent June 2022 Memorandum of Understanding do not constitute waivers by CHH, as argued by the City. Rather, these compromises constitute mitigation efforts by CHH to make forward progress.

City Heights Holdings, LLC v. City of Cle Elum  
Page 8 of 12

Judicial Dispute Resolution LLC  
1425 Fourth Ave., Suite 300 Seattle, WA 98101  
206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 14 of 20

sense to me,…What I am concerned about is whether the City's hands are tied in this instance, or not…

The City Manager urged the DOE to work "its way up the chain of command" and explore whether the DOE, unlike the City, is bound by the Development Agreement.

The City Project Manager sent a similar email to the Department of Archaeology & Historic Preservation (DAHP) and the Yakima Nation Tribe, in which the City encouraged these entities to challenge the Development Agreement. The City Project Manager sent a similar email to the Department of Natural Resources (DNR), encouraging DNR to take unfounded enforcement action against CHH:

> As you know, one of their arguments is that they have a Development Agreement with the City and that precludes state and federal agencies such as DOE from exercising their jurisdiction and authority. The City does not share that perspective and ***we stand ready to support your efforts***. That being said, the City is the one party that is in fact a party to what is an ***amazingly one-sided agreemen***t, so the ***City may have to tread a bit more lightly*** than your agency does. (Emphasis added).

In these emails, the City affirmatively misrepresents the Development Agreement and the role of state agencies.[9] These are blatant misrepresentations, given the first Arbitration Award that rejected the City's interpretation. The emails are plainly intended to incite other agencies to challenge the Development Agreement in direct violation of the City's duties of good faith and fair dealing.

The City's noncompliance led to a second arbitration demand, filed by CHH on October 4, 2021. Once again, the City's interpretation of the Development Agreement was rejected and once again the City was directed to comply with the contract. Once again, the City's dissatisfaction remained. It was only after the parties engaged in additional and extensive negotiations, resulting in a Memorandum of Understanding (MOU) executed on June 1, 2022, that the Project was able to procedurally proceed.

---

[9] CHH's claims include an allegation that the City tortiously interfered with CHH's business expectations. These emails alone reflect the City's intent to disrupt and impede the Project's advancement. That said, tort claims are barred by the independent duty doctrine. Thus, injury is compensable only if it arises separately from the contract terms. Here, the injuries caused by the City's breach fully compensate CHH and I make no findings on the separate cause of tortious interference. It is notable that the *Westmark Development* case did not involve a development agreement, thus the property owner's sole recourse was alleging tortious interference.

**Significant Damages Caused by City's Breach**

For all the reasons stated above, CHH proves that the City persistently breached the Development Agreement and that CHH is damaged by the breach. It is well-settled that when one party breaches a contract, the aggrieved party should be put into the position they would have been had the contract been honored. Such damages are "based on the injured party's expectation interest and are intended to give the injured party the benefit of its bargain."[10] Here, CHH's expectation damages include net lost profits[11] and CHH amply proves its lost profits under the required legal standard of "reasonable certainty."[12]

It is well-settled that the reasonable-certainty standard applies only to the fact of damage, not the amount of damage. Thus, "once it is reasonably certain that the breach caused damages, the fact finder may determine the amount of the damage by drawing reasonable inferences from reasonably convincing evidence."[13] The fact finder has discretion to award damages within the range of relevant evidence.[14]

CHH proves that CHH would have made a profit but for the City's breach and that the City's breach reduced that profit. Even the City acknowledges that the "Parties' disputes have effectively shortened the DA [Development Agreement] by two years."[15] In the MOU, the City further expressly acknowledges that when the City fails to comply with contractual deadlines, "it is ***virtually certain*** that the Project Sponsor [City Heights] would be damaged if the Project is delayed[.]" (Emphasis added).[16]

To calculate its lost profits, CHH retained Neil J. Beaton (Beaton), a certified public accountant who is accredited in business valuation and financial forensics. To determine damages,

---

[10] *Eastlake Construction Co. v. Hess*, 102 Wn.2d 30, 46 (1984).
[11] WPI 303.04; *Alpine Industries, Inc. v. Gohl,* 30 Wn. App. 750, 754 (1981).
[12] *See Tiegs v. Watts,* 135 Wn.2d 1, 17 (1998).
[13] *Gaasland Co., Inc. v. Hyak Lumber & Millwork, Inc,* 42 Wn.2d 705, 713-14 (1953).
[14] *Mason v. Mortg. Am., Inc.,* 114 Wn.2d 842, 850 (1990).
[15] See June 2022 Memorandum of Understanding (MOU). The City disputes the cause of the parties' "disputes" resolved in the MOU. This Arbitration Award squarely places the cause of the "disputes" on the City's breach of the Development Agreement.
[16] I do not mean to suggest that the MOU's liquated damages clause governs determination of damages in this arbitration. I cite to this provision solely to demonstrate that the City acknowledges that when it breaches its contractual objections and the breach causes delay, CHH is harmed.

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 16 of 20

Beaton used the "but for" and "as is" methodology, which calculates economic damages by determining the expected development "but for" the delays and then subtracts the development after the delays in the "as is" scenario.

The City's expert, William Partin (Partin), agrees that this method is a widely-accepted means in forensic accounting by which to estimate economic damages. Rather than challenging Beaton's method, Partin contends that any lost profit calculation is simply too speculative. The City notes that new enterprises receive scrutiny when seeking lost profit. This challenge goes too far: while the City Heights' Project was unique to the region, the concept of a master planned community is neither new nor unique. In addition, CHH's plans were anchored in extensive market research and study.

The City also challenges Beaton's calculations as resting on speculation. The argument fails. Beaton's calculations are grounded in extensive review of documents such as budgets, invoices, general ledgers, and loan draws. Beaton and his staff engaged in detailed information gathering from CHH and its management, regarding revenue, projected sales, market analysis, and construction costs. Beaton also considered the opinions of Molly Carmichael (Carmichael), a market analyst with decades of experience in projecting market success of master planned communities. The courts recognize that expert testimony provides a basis for an award of lost profits, so long as the expert testimony rests on tangible evidence rather than speculation and hypothetical situations.[17] Here, Carmichael specifically considered the relevant market, rather than hypotheticals. In addition, Carmichael's decades of experience and market-based opinions constitute tangible evidence. The same applies to Sean Northrup's opinions, given his track record of numerous successful projects.

It is significant that where he could, Beaton applied the most conservative approach, resulting in conservative damages calculation. For example, Beaton reduced Carmichael's market projections regarding absorption rate for the sale of houses and lots. Further, he did not calculate damages beyond Phases 1 and 2. In this same vein, I use Beaton's most conservative calculations for purposes of awarding damages.

---

[17] *See e.g., Larsen v. Walton Plywood,* 65 Wn.2d 1, 19 (1964).

City Heights Holdings, LLC v. City of Cle Elum  
Page 11 of 12

Judicial Dispute Resolution LLC  
1425 Fourth Ave., Suite 300 Seattle, WA 98101  
206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 17 of 20

For all these reasons, CHH is awarded $20,340,000.00 in economic damages for the "but for" scenario with sales beginning December 2021. CHH is awarded $1,890,175.00 in interest accrued on past costs. The total Award is $22,230,175.00. Should CHH seek prevailing party attorney fees and costs, it will be the subject of further briefing and a Supplemental Award.

As noted, I submit this letter at the parties' request in addition to the Arbitration Award. It is not part of the Award.

Best regards,

*Paris K. Kallas*

Judge Paris K. Kallas, ret.
Arbitrator

City Heights Holdings, LLC v. City of Cle Elum
Page 12 of 12

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669  www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 18 of 20

IN ARBITRATION
JUDICIAL DISPUTE RESOLUTION, LLC

CITY HEIGHTS HOLDINGS, LLC,

        Claimant,

v.

CITY OF CLE ELUM,

        Respondent.

ARBITRATION AWARD

The parties submitted this matter to arbitration. City Heights Holdings, LLC (City Heights) is represented by Margaret Y. Archer and Ryan C. Espegard of Gordon Thomas Honeywell LLP and Duana T. Koloušková and Dean Williams of Johns Monroe Mitsunaga Kolouskova PLLC. The City of Cle Elum (the City) is represented by Alexandra Kenyon and Michael Kenyon of Kenyon Disend, PLLC, Kenneth W. Harper of Menke Jackson Beyer, LLP, and Rebecca S. Ashbaugh and Brittney S. Rivers of Ashbaugh Beal LLP.

The arbitration hearing took place over nine days, beginning September 30 and concluding October 10, 2024. The parties submitted testimony, expert reports, and thousands of pages of exhibits. At the conclusion of the hearing, the City withdrew its counterclaim for unpaid fees and costs incurred in reviewing and processing land use applications.

ARBITRATION AWARD
Page 1 of 2

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669 www.jdrllc.com

25-01128-WLH9  Doc 17  Filed 07/02/25  Entered 07/02/25 10:32:14  Pg 19 of 20

Having considered the testimony, the credibility of witnesses, the exhibits, the argument of counsel, and the governing law, the following Award is entered.

IT IS HEREBY ORDERED:

1. City Heights is awarded $20,340,000.00 in damages and $1,890,175.00 in interest, for a total Award of $22,230,175.00.

2. The Award shall bear interest from the date of confirmation at the rate of twelve percent (12%) per annum.

3. Any motion seeking recovery of prevailing party attorney fees and/or costs shall be filed no later than thirty (30) days of the date of this Award.

4. Any subsequent award of attorney fees and/or costs will be treated as a supplemental award. Such a supplemental award shall neither amend nor delay enforcement of this Award.

Dated this 5th day of November, 2024.

*Paris K. Kallas*

Judge Paris K. Kallas, ret.
Arbitrator

ARBITRATION AWARD
Page 2 of 2

Judicial Dispute Resolution LLC
1425 Fourth Ave., Suite 300 Seattle, WA 98101
206-223-1669 www.jdrllc.com

25-01128-WLH9    Doc 17    Filed 07/02/25    Entered 07/02/25 10:32:14    Pg 20 of 20