JOHN S. KAPLAN (WSBA No. 23788)
BRYAN T. GLOVER (WSBA No. 51045)
BRANDON E. LIRA, *Pro Hac Vice*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
Email: john.kaplan@stoel.com
      bryan.glover@stoel.com
      brandon.lira@stoel.com

*Attorneys for Debtor*

The Honorable Whitman L. Holt
Chapter 9
Hearing Date: August 7, 2025
Hearing Time: 11:00 am
Objection Deadline: At Hearing
Location: Telephonic

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON
YAKIMA DIVISION

In re:

CITY OF CLE ELUM,

          Debtor.

Case No. 25-01128-WLH9

AMENDED NOTICE OF MOTION
AND COMBINED MOTION TO
EXPEDITE HEARING AND FOR
ENTRY OF AN ORDER
(1) AUTHORIZING THE DEBTOR TO
INCUR A SECURED DEBT TO
UMPQUA BANK AND (2) GRANTING
RELATED RELIEF

## AMENDED NOTICE

**PLEASE TAKE NOTICE** that the City of Cle Elum (the "City" or "Debtor"), the debtor in the above-captioned chapter 9 case (the "Case"), has moved for entry of an order ("Motion") by the U.S. Bankruptcy Court for the Eastern District of Washington at Yakima approving its incurrence of a secured debt to Umpqua Bank. A copy of the Motion, which sets forth the legal and factual bases for the relief sought therein, is freely available from the City's claims, notice, and solicitation agent, Stretto, Inc. ("Stretto"), through its publicly accessible webpage

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 1

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

located at https://cases.stretto.com/cleelum/. Additional information about the bankruptcy case may be obtained by calling Stretto's case information line at 855.926.2377 (Toll-Free) and 949.506.5124 (International). You may also submit an inquiry via email to TeamCleElum@stretto.com.

**PLEASE TAKE FURTHER NOTICE** that the motion is set for the following hearing at the following time and place:

| | |
|---|---|
| DATE: | August 7, 2025 (*CORRECTED*) |
| TIME: | 11:00 am |
| TELEPHONIC: | 1-877-402-9757, Access code #9960114 |

The hearing on the Motion shall be conducted via telephone before the Honorable Whitman L. Holt.[1] Telephonic attendees are responsible for their own adherence to the court's procedures for telephonic participation and bear all risk of technological failure.

**PLEASE TAKE FURTHER NOTICE** that any interested party wishing to object to the relief sought in the Motion must subject an objection with the court, either in writing or orally, before or at the hearing. **Your failure to object may result in the court granting the relief requested in the Motion.**

**PLEASE TAKE FURTHER NOTICE** that Debtor has sought to reduce the time for the submission of objections pursuant to Local Rule 2002-1(c)(2) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules"). In the event that the court denies Debtor's request, the Objection Deadline may become enlarged in accordance with Local Rule 2002-1(c)(1) or other applicable law.

* * * * *

[1] The telephonic access information is subject to change without further notice. Parties are advised to contact the clerk or consult the court's webpage at https://www.waeb.uscourts.gov/judge/chief-judge-whitman-l-holt if they require further information regarding telephonic appearances.

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 2

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

## MOTION

City of Cle Elum (the "City" or "Debtor"), the debtor in the above-captioned chapter 9 case (the "Case"), moves for entry of an order ("Motion") by the U.S. Bankruptcy Court for the Eastern District of Washington at Yakima authorizing the City to incur a secured debt to Umpqua Bank ("Umpqua"), one of its pre-petition lenders, in order to prevent Umpqua from seeking authority to terminate the City's pre-petition revolving accounts upon which the City's employees rely to conduct their duties. The Motion is brought pursuant to Sections 105(a), 364(c), and 902(1) of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of the Motion, Debtor respectfully states as follows:

### I. JURISDICTION AND VENUE

1. The Debtor is a city in the State of Washington and a municipality within the meaning of Sections 101(40) and 109(c) of the Bankruptcy Code.

2. This court has jurisdiction over this Case and the Motion pursuant to Sections 157 and 1334 of Title 28 of the United States Code (the "Judicial Code").

3. This is a core proceeding pursuant to Section 157(b)(2) of the Judicial Code.

4. In the event that the court determines that it lacks constitutional authority to enter final orders of adjudication on the subject matter of the Motion, Debtor expressly consents to the entry of such final adjudications.

5. Venue for this matter is proper in the Eastern District of Washington pursuant to Sections 1408 and 1409 of the Judicial Code.

### II. PRELIMINARY STATEMENT

6. The Debtor commenced this Case by filing its *Voluntary Petition for Non-Individuals Filing for Bankruptcy* (the "Petition") seeking relief under

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 3

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

Chapter 9 of Bankruptcy Code in this court on June 24, 2025 (the "Petition Date"). Further information about the events which have precipitated the commencement of this Case together with a description of the state in which these events have left Debtor's finances are set forth in fuller detail in the Declaration of Matthew Lundh in Support of Cle Elum's Petition for Relief Under Chapter 9 of the Bankruptcy Code (the "First-Day Declaration") [Dkt. No. 12].

7. Prior to the Petition Date, the City maintained business relationships with various entities through which the City received certain financial accommodations, including, without limitation, a revolving credit account issued by Umpqua (the "Umpqua Revolving Account"). It is the City's understanding that Umpqua asserts Sections 365(c)(2) and/or 365(e)(2) of the Bankruptcy Code permit Umpqua to enforce certain *ipso facto* clauses delineated in the underlying account agreements. Under the specific circumstances of this Case, the City believes that it would be more advantageous for the City to resolve this matter without litigation by obtaining the court's approval of the revised post-petition credit card terms delineated herein.

8. For the preceding reasons, the City seeks authorization to obtain secured, post-petition credit from Umpqua Bank by (1) making a one-time $50,000.00 deposit (the "Umpqua Deposit") into a segregated account with Umpqua Bank (the "Blocked Account"); (2) granting Umpqua Bank a first-position lien on the Umpqua Deposit in the Blocked Account; and (3) obligating Umpqua Bank, subject to the terms and conditions of the Credit Agreement (as defined below), to keep open the Umpqua Revolving Account with a combined credit limit of not less than $50,000.00 (subject to enlargement in an amount not to exceed $150,000 based on the provision of additional deposits and Umpqua's

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 4

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

credit review and approval). Additional material lending terms, including the statement required by Rule 4001(c), are set forth hereinafter.

9. The City believes that the foregoing terms are commercially reasonable, wishes to maintain its lending relationship with its primary bank, relies on the Umpqua Revolving Account for the orderly conduction of its financial affairs, and submits that approval of the credit terms offered by Umpqua is in the best interests of the City and its creditors.

## III. REQUEST TO EXPEDITE HEARING

10. For the reasons stated herein, the relief sought in the Motion is essential to maintaining the value of the Debtor's bankruptcy estate while it seeks to conduct an orderly adjustment of its debts.

11. The Debtor believes that the Motion requires an expedited hearing and shortened notice period pursuant to Local Rule 2002-1(c)(2), which permits the court to reduce such periods for cause.

12. Any delay in the adjudication of the Motion may delay the Debtor's successful completion of this Case, disrupt the Debtor's ordinary course of business, and impair Debtor's ability to bring other requests for relief as may be necessary and appropriate in the Case.

13. The Debtor does not anticipate opposition to the Motion, and the relief sought in the Motion will not prejudice the rights of interested parties.

14. For each of these reasons, Debtor submits that cause exists to shorten the notice and objection period for the Motion pursuant to the Local Rule 2002-1(c)(2) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules").

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

## IV. REQUEST TO INCUR SECURED DEBT PURSUANT TO SECTION 364(C) OF THE BANKRUPTCY CODE

15. Section 364(c) of the Bankruptcy Code provides as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

16. The preceding statute applies (1) to this Case by operation of Section 901 of the Bankruptcy Code, and (2) where the trustee and property of the estate are referenced therein, to the City and its property by operation of Sections 902(1) and 902(5) of the Bankruptcy Code. *See also Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 339 F.3d 782, 789 (9th Cir. 2003) (recognizing the authority of Chapter 9 debtors to incur debt under Section 364).

17. The City seeks to incur a secured debt pursuant to Section 364(c)(2) of the Bankruptcy Code, which permits the court to authorize borrowing secured by a lien on otherwise unencumbered property. That statute applies to this Motion because the Umpqua Deposit will be funded by monies of the debtor which are unencumbered.[2]

---

[2] The City's demand deposits, which are primarily deposited at Umpqua Bank, were partially encumbered by certain writs of garnishment issued against the City. Those garnishments, however, did not fully encumber the City's deposits with Umpqua and the City has sufficient unencumbered funds in those same accounts to make the Umpqua Deposit from such unencumbered funds.

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 6

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

18. The status of existing liens and property rights is not affected by the proposed borrowing. To the extent that any pre-petition creditors would seek to assert a contractual right prohibiting the City from incurring additional secured obligations, such clauses are unenforceable against a debtor in possession. *See also In re Specialty Prods. Holding Corp.*, 2010 Bankr. LEXIS 6212, at *22-23 (Bankr. D. Del. Jul. 1, 2010) (providing for nullification of contractual restrictions on post-petition financing, including restrictions on granting of liens, in debtors' prepetition agreements).

19. Decisions concerning the management of a debtor's property, including decisions to borrow money, should generally be approved unless such debtor has failed to exercise its business judgment (*i.e.*, acted arbitrarily and capriciously) by seeking credit upon unreasonable terms or for improper purposes. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment. . . was reasonable under the circumstances and in the best interests of [the debtor] and its creditors"). Under the rule, bankruptcy courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision. Punctilious scrutiny would bog down the administration of a debtor's case and unnecessarily increase costs to the detriment of its pre-petition creditors. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

20. Bankruptcy courts have recognized that they "may not approve any credit transaction under subsection (c) [of Section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr.

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 7

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

S.D.N.Y. 1990). These decisions, however, arise in Chapter 11 cases where all subsections of Section 364 apply. Yet Chapter 9 cases are unique. Rendering Section 364(c) its proper meaning in a Chapter 9 case requires that the statute be construed in conjunction with Section 901 of the Bankruptcy Code.

21. Neither Section 364(a) (which permits general unsecured lending) nor Section 364(b) (which permits administrative-priority lending) apply to Chapter 9 cases. *See* 11 U.S.C. § 901(1). Accordingly, there is no statutory basis upon which a municipal debtor can offer administrative priority as security to its potential post-petition lenders. Because the City cannot offer administrative priority to its potential post-petition lenders, the City submits that the otherwise applicable requirement that a debtor demonstrates that unsecured loans are not available before incurring secured debts should be excused. *See In re Caldor, Inc.-NY*, 240 B.R. 180, 189 (Bankr. S.D.N.Y. 1999) (excusing the requirement that the debtor shop around for superior lending terms where the estate was administratively insolvent and thus incapable of offering potential lenders that inducement as security), *aff'd*, 266 B.R. 575 (S.D.N.Y. 2001).

22. Further, the City does not believe that it could obtain satisfactory credit on an unsecured basis even if administrative priority were able to be offered to such hypothetical lender. Lending to a debtor in possession requires complicated underwriting, and those complexities are even thornier in Chapter 9. Yet the debtor needs access to working capital now and a protracted underwriting process—which may or may not result in unsecured lending, *see*, *e.g.*, First-Day Declaration ¶¶ 58, 61-63—would unduly delay the City's access to the working capital that its employees and departments rely upon to complete their duties. *Cf. In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (recognizing that a

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

court may approve a truncated marketing process where a debtor has an urgent need for capital).

23. Based on its lengthy pre-petition relationship with the City and its knowledge of the City's finances, Umpqua is uniquely positioned to extend credit and other financial accommodations to the City on an expedited and commercially reasonable basis. The City submits that it has negotiated fair and reasonable terms with Umpqua, and that those terms should be approved. True and correct copies of the *Commercial Card Account Agreement* (the "Account Agreement") and the *Commercial Card Assignment of Account* (the "Assignment Agreement," and together with the Account Agreement, the "Credit Agreement"), which together comprise an integrated financial accommodation through which Umpqua will offer secured credit cards for use by the City's employees, are attached hereto as **Exhibit A** and **Exhibit B**.

24. For the preceding reasons, the court should enter an Order authorizing the City to incur credit pursuant to the Credit Agreement, which consists of the following terms and conditions:

**RULE 4001(C) STATEMENT**

| TERM | SUMMARY | PROVISION IN RELEVANT DOCUMENT(S) |
| --- | --- | --- |
| Lender(s) | Umpqua Bank | |
| Borrower(s) | The City of Cle Elum | |
| Guarantor(s) | None. | |
| Borrowing Limits | $50,000.00 | Reserved for bank's discretion by ¶ 23(b) |
| Interest Rate | 21.99% (purchase) to 23.99% (cash advance) initial interest rate. | Account Agreement ¶ 13. |
| Termination | Voluntary termination: Upon 90-days' notice without cause but subject to possible early termination fees. | Account Agreement ¶¶ 22(b) and 22(c). |

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 9

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

| | | |
|---|---|---|
| | Involuntary termination: (i) failure to pay any amounts due and owing; (ii) occurrence of event of default; and (iii) the City's breach of contractual obligations. | |
| Events of Default | Primary events of default (which include cross-default provisions): (i) payment default; (ii) material adverse change in creditworthiness; (iii) false representations by the City; (iv) failure of collateralization; (v) breach of Commercial Cardholder Agreement; (vi) overused credit lines; and (vii) Umpqua deems its rights impaired or at risk. | Account Agreement ¶ 16; and<br><br>Assignment Agreement at pp. 2-3. |
| Security | (i) Security interest in the Blocked Account; and (ii) right of setoff against the Blocked Account. | Assignment Agreement at p. 1. |
| Perfection-Related Waivers | None. | None. |
| Releases | None. | None. |
| Indemnifications | To the extent such limitation of liability is permitted by law, (i) bank will not be liable for any indirect, special, consequential, incidental, punitive, or exemplary damages or losses, whether or not foreseeable, (ii) bank will not be liable for any loss or damage arising directly or indirectly from or in connection with any inaccuracy, act or failure to act on the part of any person not within bank's reasonable control, or any error, failure, or delay in execution of any transaction resulting from circumstances beyond bank's reasonable control, including, but not limited to, any inoperability of communications facilities or other technological failure, and (iii) bank will not be liable for anything relating to the account, commercial cards or this agreement except to the extent directly arising as a result of bank's own gross negligence or willful misconduct. Provided bank has complied with its obligations under this agreement, and subject to applicable law, company agrees to indemnify, defend, and hold bank harmless against any third party claim arising from, or in connection with, directly or indirectly, any use of any commercial card, the account, this agreement, or any related service provided by bank. | Account Agreement ¶ 34 |
| Avoidance-Action Liens | None. | None. |

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 10

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

| Fees | (i) various usual and customary account fees summarized in table attached to Account Agreement; (ii) attorneys' fees; (iii) perfection fees; and (iv) contingent early termination fees. | Account Agreement at p. 9 (summary table);<br><br>Account Agreement ¶ 16;<br><br>Assignment Agreement at p. 4; and<br><br>Account Agreement ¶ 22(b). |
|---|---|---|
| Conditions Precedent | The City: (i) executes and delivers to Umpqua the Credit Agreement and the court approves the same, (ii) reduces its outstanding revolving balances to zero; and (iii) remits the Umpqua Deposit. | Account Agreement ¶ 3. |
| Adequate Protection Terms | None. | None. |
| Cash Collateral Terms | None. | None. |
| Automatic Stay Terms | None. | None. |
| Plan-Related Terms | None. | None. |

## V. NO PRIOR REQUEST

25. No prior request for the relief sought in this Motion has been made to this or any other court.

## VI. RESERVATION OF RIGHTS

26. The City files this Motion without prejudicing or waiving its rights under Section 904 of the Bankruptcy Code to be free from court-imposed restrictions on the use and enjoyment of its assets as well as the free exercise of its political authority arising under applicable Washington law.

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

## VII. CONCLUSION

27. For the foregoing reasons, the City believes that the relief sought in the Motion is necessary and in the best interests of the City, its citizens, and its creditors.

**WHEREFORE**, the City respectfully requests that this court grant the Motion and enter an Order authorizing the City to incur credit pursuant to the Credit Agreement and pledge $50,000 of its cash to secure the employee credit cards, and award to the City such other and further relief as the court may deem proper.

DATED: July 31, 2025.

STOEL RIVES LLP

*/s/ John S. Kaplan*

John S. Kaplan, WSBA No. 23788
Bryan T. Glover, WSBA No. 51045
Brandon E. Lira, *Pro Hac Vice*
600 University Street, Suite 3600
Seattle, WA 98101
T. (206) 624-0900
Email: john.kaplan@stoel.com
bryan.glover@stoel.com
brandon.lira@stoel.com

*Attorneys for Debtor*

AMENDED NOTICE OF MOTION AND COMBINED MOTION TO EXPEDITE HEARING AND FOR ENTRY OF AN ORDER (1) AUTHORIZING THE DEBTOR TO INCUR A SECURED DEBT TO UMPQUA BANK AND (2) GRANTING RELATED RELIEF - 12

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*


# Commercial Card Account Agreement

This Commercial Card Account Agreement (this "Agreement") sets forth the terms of the Umpqua Bank Commercial Card Account for ________________________________________ ("Company") and is entered into effective as of______________(the "Effective Date"). The Account has been opened in the name of Company pursuant to the credit application submitted by Company ("Application") to Umpqua Bank (together with its successors and assigns, "Bank") pursuant to which Commercial Cards will be issued for extensions of credit by Bank in accordance with the terms of this Agreement.

1. **Definitions.** In this Agreement the following definitions shall apply:

   **"Account"** means the commercial card account established pursuant to this Agreement that includes, collectively, each individual credit card account established in connection with a Commercial Card issued pursuant to this Agreement and for which Company is fully liable in accordance with this Agreement.

   **"Annual Percentage Rate"** or **"APR"** means an annualized rate of Finance Charge, as determined by Bank.

   **"Authorized Officer"** means each individual who signed the Application and/or this Agreement on behalf of Company and such other individuals as may be authorized by the Company from time to time.

   **"Cash Advance"** means a Transaction to obtain a cash loan from Bank or other financial institution that accepts the Commercial Card (whether through an ATM, a teller at a branch, merchant or otherwise) and/or a loan from Bank through use of any checks or drafts Bank may provide for drawing funds from Bank to be posted as Cash Advances on the Account (any surcharges charged by any owner or operator of any ATM, merchant or by Bank, or by any other bank with respect to the Cash Advance will be deemed a part of the Cash Advance).

   **"Commercial Card"** means each Visa® credit card that is issued to a Commercial Cardholder under the Account pursuant to this Agreement.

   **"Commercial Cardholder"** means an employee of Company who is designated by Company to receive a Commercial Card and who holds a Commercial Card to effect Transactions during the term of this Agreement.

   **"Commercial Cardholder Agreement"** means the Commercial Cardholder Agreement that applies to each Commercial Card and whose terms bind a Commercial Cardholder.

   **"Company"** has the meaning given such term in the introductory paragraph of this Agreement.

   **"Digital Wallet"** means a digital wallet, such as Apple Pay®, Samsung Pay®, Google Pay®, or Amazon One®, or any other electronic payment system into which a Commercial Card may be enrolled on any mobile phone, tablet, watch or other device that supports an electronic payment system or any other biometric payment system into which a Commercial Card may be enrolled.

   **"Finance Charge"** means any charge to the Account by Bank that is calculated and assessed in accordance with this Agreement or a Commercial Cardholder Agreement.

   **"Initial Term"** means the period commencing on the Effective Date and continuing for a period of ______________ .

   **"Purchase"** means a Transaction made to purchase or lease goods or services, or pay amounts Company or any Commercial Cardholder owes (excluding Cash Advances).

   **"Periodic Statement"** or **"Billing Statement"** means a written record of the activity on the Account (purchases, payments, fees, etc.) anticipated to be supplied to Company by Bank on a monthly basis or at set intervals such as weekly or bi-weekly.

   **"Pricing Information"** means the pricing information set forth on the last page of this Agreement, as such pricing information may be changed or updated from time to time by Bank in its sole discretion as set forth on the last page of this Agreement.

   **"Renewal Term"** means each one-year renewal period following the Initial Term or such other renewal period determined by Bank.

   **"Transaction"** means any Account activity that has a debit value.

2. **Acceptance of this Agreement.** Upon an Authorized Officer's execution of the Application, the issuance of a Commercial Card, use of Commercial Card or establishment of the Account, the Company agrees to be bound by this Agreement, as well as any other agreements, disclosures, rules, or notices relating to the Commercial Cards and/or the Account as may be posted on Bank's website or otherwise made available to Company and as amended from time to time. Company represents and warrants that (a) Company has all necessary corporate or applicable organizational authority and has taken all action necessary to enter into this Agreement and to perform Company's obligations hereunder, (b) this Agreement has been duly executed and delivered by Company and is a legal, valid, and binding obligation, enforceable against Company in accordance with the terms hereof, and (c) the Authorized Officer signing is duly authorized to execute and deliver this Agreement on Company's behalf.

3. **Conditions to Issuance of Commercial Cards and Opening of Account**. Bank's obligation to issue a Commercial Card, allow use of a Commercial Card, and establish the Account shall be subject to satisfaction of the following conditions on or before [DATE]: (i) Company shall have obtained in a form acceptable to Bank authorization to enter into this Agreement and that certain Commercial Card Assignment of Account dated as of the date hereof (the "***Security Agreement***"), and to perform its obligations hereunder and thereunder, from the United States Bankruptcy Court for the Eastern District of Washington in its pending bankruptcy proceeding, (ii) Company shall have paid current all amounts owing under that certain Commercial Card Account Agreement with Bank dated August 5, 2019; and (iii) Company shall




have deposited into a blocked account at Bank the sum of $50,000 United States dollars as collateral pursuant to the Security Agreement.

4. **Ownership of Commercial Cards.** Each Commercial Card remains the property of Bank. Bank can revoke Company's and/or any Commercial Cardholder's right to use a Commercial Card or the Account at any time. Bank may do this with or without cause and without giving Company or the applicable Commercial Cardholder notice. Upon revocation by Bank of a Commercial Cardholder's right to use a Commercial Card or the Account, Commercial Cardholders must immediately discontinue use of the Commercial Cards and shall, upon request by Bank, destroy the Commercial Cards.

5. **Program Administration.** Company shall designate in writing to Bank a Program Administrator to actively manage the Account on Company's behalf. If not specifically designated by Company, the Program Administrator shall be the first Authorized Officer listed in the signature block of the Application. Company agrees and acknowledges that such Program Administrator is duly authorized by Company to act on Company's behalf with respect to the Account, and that Bank may rely on all directions and information Bank receives from the Program Administrator regarding the Account, including issuance of Commercial Cards to employees of Company. The Program Administrator's responsibilities shall include:
   - (a) Conducting maintenance on the Account;
   - (b) Collecting Commercial Card request forms, ensuring proper authorization of Commercial Cardholders, and facilitating new Commercial Card orders;
   - (c) Communicating Company policy to all Commercial Cardholders that restricts the use of the Commercial Card to business purposes only;
   - (d) Accessing and monitoring spending reports for the Account;
   - (e) Regularly auditing Company's expense management program to ensure compliance with Company policies;
   - (f) Maintaining appropriate internal Company forms, policies, procedures, approved and prohibited usage guidelines, web site details and training materials for the Account consistent with this Agreement, the Commercial Cardholder Agreements and the other terms and conditions governing the Account;
   - (g) Maintaining hierarchical approval of all Purchases;
   - (h) Being familiar with all aspects of the Account and each Commercial Card;
   - (i) Handling all Company and Commercial Cardholder inquiries and billing disputes, credit line increase requests, and other requests and notices under this Agreement;
   - (j) Upon request, providing Bank with such information and documentation as Bank may deem necessary to protect Bank's interests;
   - (k) Promptly advising Bank of any termination of any Commercial Cardholder employment relationships with Company and, upon such termination, collect and destroy the associated Commercial Card; and
   - (l) Immediately notifying Bank by phone and in writing of any reported or suspected unauthorized use of or access to any Commercial Card or the Account.

6. **Scope of Commercial Card Program.** This Agreement shall apply to Cash Advances and Purchases by Company, its subsidiaries, divisions, or affiliates as approved by Bank, and Commercial Cardholders. Bank is a card-issuing member of Visa®, USA, Inc. and Visa® International and may issue credit cards and establish credit card accounts to designated employees of Company as set forth in this Agreement. Company will designate employees who are to receive Commercial Cards and become Commercial Cardholders, and unless Bank notifies Company to the contrary, Bank will issue Commercial Cards to such employees. Unless Bank notifies Company to the contrary, or a Commercial Card has been terminated as provided herein, all Commercial Cards will expire upon termination of this Agreement. Bank may elect in its sole discretion not to issue a Commercial Card to an employee that Company wishes to receive such Commercial Card. Any or all charging privileges may also be withdrawn with or without cause at any time and with or without notice.

7. **Use of Account.** Company and the Commercial Cardholders may use the Account for Purchases and Cash Advances wherever the Commercial Card is honored. Company agrees not to use, and agrees that the Commercial Cardholders will not use, the Account for any transaction that is primarily for personal, family or household purposes. Company and Commercial Cardholders will not conduct or attempt to conduct any Transaction that conceals or attempts to conceal the nature of the Transaction or circumvents provisions of this Agreement (for example, and without limitation, conducting gambling transactions or Cash Advances as Purchases). Company agrees to accept credits to the Account instead of cash refunds when the original Purchase was charged to the Account. Company agrees not to use, and agrees that the Commercial Cardholders will not use, the Account for any illegal transactions. In addition, if a Purchase is made using the proxy payment service of Priority Technology Holdings, Inc., then the Company and Commercial Cardholders shall not use such services in connection with any illegal transactions, and Priority Technology Holdings, Inc. shall be a third-party beneficiary of this prohibition of such use. Company acknowledges that Bank provides the Commercial Cards as an accommodation party only and, except as otherwise expressly provided by law or herein, Bank is not responsible for the manner in which the Commercial Cards are used. Bank may authorize Commercial Cardholders to use Commercial Cards through a Digital Wallet. Use of Commercial Cards through a Digital Wallet is subject to Bank's Digital Wallet Rules and Regulations posted on Bank's website, as amended from time to time.

8. **Refusal to Honor Commercial Card.** Bank will not be responsible for a merchant's or financial institution's refusal to honor the Commercial Card. Bank also reserves the right to deny authorization of any Purchase or Cash Advance. Except as otherwise required by applicable law or regulation, Bank will not be responsible for merchandise or services purchased or leased through use of any Commercial Card or the Account.

9. **Obligations on the Account.** Bank is authorized to pay and charge the Account for all Purchases and Cash Advances made or obtained by any Commercial Cardholder or anyone authorized to use a Commercial Card or the Account. Company promises to pay Bank for all of these Transactions, plus any related Finance Charges assessed on the Account and any other charges and fees that Company may owe



Bank under the terms of this Agreement and any charges and fees that Commercial Cardholders may owe Bank under the terms of the applicable Commercial Cardholder Agreement. Company will be obligated to pay Transactions posted to the Account whether resulting from (a) actual use of a Commercial Card, (b) mail order or telephone, computer or other electronic Purchases made without presenting the Commercial Card, (c) use of a Commercial Card through a Digital Wallet, and (d) any other circumstance where a Transaction is authorized by Company or a Commercial Cardholder, or authorized by someone else with apparent authority to effect a Transaction to the Account.

10. **Statements.** Bank will send each Commercial Cardholder a statement at the end of each billing cycle in which the Account reflects a debit or credit balance for a Commercial Cardholder (i.e., the total amount of Transactions, Finance Charges and other charges (including, without limitation, any fees) and amounts due under the applicable Commercial Cardholder Agreement, net of any payments and credits, as shown on such Commercial Cardholder's Billing Statement (such amount for such Commercial Cardholder, the "New Balance")) or if a Finance Charge has been imposed. Among other things, the Periodic Statement will: itemize Transactions, credits and adjustments; show any Finance Charges; and set forth the New Balance, the credit limit, available credit, and the date on which the New Balance is due and payable in full ("Payment Due Date").

11. **Payments.** *Individual Billing.* If individual billing is selected, Bank will bill each Commercial Cardholder for such Commercial Cardholder's New Balance, which amount is due in full, on or before the Payment Due Date identified therein. Notwithstanding that Bank will bill each Commercial Cardholder for such Commercial Cardholder's New Balance, Company is responsible for full payment of the New Balance for each Commercial Cardholder on or prior to the Payment Due Date, independent of any agreement or program for reimbursement that may exist between Company and Commercial Cardholders and independent of any attempts of Bank to bill or collect the New Balance from a Commercial Cardholder.

    *Central Billing.* If central billing is selected, Bank will bill Company for all New Balances under the Account, and Bank will send each Commercial Cardholder a Billing Statement showing the applicable New Balances for informational purposes. Company will pay Bank directly the total amount of all New Balances under the Account, as shown on the applicable Periodic Statement.

    *General Terms for Both Billing Methods.* All payments must be made in U.S. Dollars. Any payment made by check or other item must be drawn on a financial institution located in the United States. Company and each Commercial Cardholder agree not to deduct or withhold, without Bank's prior written approval, any amount shown as due on a Billing Statement. Acceptance of late payments, partial payments or any payment marked as being payment in full or as being a settlement of a dispute will not affect any of Bank's rights to payment in full. Company and each Commercial Cardholder agree that payment terms set forth herein supersede any agreement with regard to payment terms established between Company or any Commercial Cardholder and the seller of goods or services or any payment terms that might be imputed to Company or any Commercial Cardholder and the seller under applicable law for goods or services purchased using Commercial Cards. Subject to any mandatory provisions of applicable law, all payments made on the Account will be applied to balances in the Account in the manner Bank determines. In general, Bank applies payments to lower APR balances before higher APR balances, which means, among other things, finance charges will increase if Transactions are made that are subject to higher APRs. If payment does not conform to the requirements stated above, crediting of the Account may be delayed. If this happens, additional charges may be imposed.

12. **Cash Advances.** Upon consent by Company, a Commercial Cardholder may use the Commercial Card to obtain Cash Advances.

13. **Finance Charges.** Finance Charges begin on the date of the Transaction, or the first day of the Commercial Cardholder's billing cycle in which the Transaction is posted, whichever is later. However, Finance Charges will be imposed on Purchases only if the entire New Balance, as shown on the Commercial Cardholder's Billing Statement, is not paid in full on or before the Payment Due Date. The Annual Percentage Rates for Cash Advances and Purchases are described below. In each case, the periodic rate is calculated by dividing the APR by the total number of days in the calendar year (i.e., 365 or 366).

    Bank calculates the Finance Charge on Cash Advances by applying the periodic rate to the "average daily balance" of Cash Advances (including current Transactions). The "average daily balance" equals the sum of "daily balances" during the billing cycle divided by the total number of days in the billing cycle. The "daily balance" for each day equals the beginning balance of Cash Advances for such day (including any past due Finance Charges on Cash Advances), plus any new Cash Advances during such day, less any applicable payments or credits made during such day.

    The **Annual Percentage Rate or APR** for Cash Advances currently is **23.99%.** Depending on qualifications, other rates for Cash Advances may apply or be available and notice thereof will be provided to Company and/or the Commercial Cardholder. The minimum **Finance Charge** on combined Cash Advance and Purchase balance is **$1.00**.

    Bank calculates the Finance Charge on Purchases by applying the periodic rate to the "average daily balance" of Purchases (excluding current Transactions). The "average daily balance" equals the sum of "daily balances" during the billing cycle divided by the total number of days in the billing cycle. The "daily balance" for each day equals the beginning balance of Purchases (including any Finance Charges on Purchases) for such day, less any applicable payments or credits made on such day. The calculation of "daily balance" does not include any new Purchases made on the applicable day.

    The **Annual Percentage Rate or APR** for Purchases currently is 21.99%. Depending on qualifications, rates other than the standard APR for Purchases may apply or be available and notice thereof will be provided to Company and/or the Commercial Cardholder. The minimum **Finance Charge** on the combined Purchase and Cash Advance balance is **$1.00**.

    If "special" Finance Charge offers are in effect from time to time, Bank will separately identify them on the Periodic Statement and separately disclose on the Periodic Statement the balances to which the special offers apply. These separate balances and the related periodic Finance Charges will be calculated in the same manner as described above. Any such special Finance Charge arrangements may be forfeited if Company or any Commercial Cardholder breaches, or is in default under, this Agreement, a Commercial Cardholder Agreement or any

other agreement governing use of the Account, in which case the above described APRs may apply.

14. **Foreign Currency Transactions.** Transactions in foreign currencies will be converted to U.S. Dollars at the exchange rate determined by Visa®USA, Inc. or its affiliates ("Visa®"), using Visa® currency conversion procedures. Currently, the currency conversion rate is generally either wholesale market rate or a government-mandated rate in effect for the date of conversion, determined by Visa® in its sole discretion. The currency conversion rate used on the conversion date may differ from the rate in effect on the date of use of the Commercial Card. A conversion international transaction charge will be charged to the Card for Transactions in foreign currencies. In addition, an International Transaction Fee in the amount set forth in the Pricing Information will be charged if such transaction was in U.S. Dollars but charged by a merchant who is outside of the U.S.

15. **Other Charges.** In addition to any Finance Charge, the following other charges will be applicable to the Account:
    (a) **Late Fee.** If payment is not received by the Payment Due Date shown on the Commercial Cardholder's Billing Statement, a late payment fee in the amount set forth in the Pricing Information may be charged. For the avoidance of doubt, this late payment fee applies each time a Commercial Cardholder's New Balance is not paid by the applicable Payment Due Date.
    (b) **Return Check Fee.** If a financial institution does not honor the check, ACH withdrawal or other payment method used to pay amounts owing under a Commercial Cardholder Agreement or Bank must return a check because it is not signed or is otherwise irregular, Bank may charge a return check fee in the amount set forth in the Pricing Information. For the avoidance of doubt, this return check fee applies to each instance where a check, ACH withdrawal or other payment method used that is not honored.
    (c) **Payment by Phone Fee.** Bank may charge a fee in the amount set forth in the Pricing Information if Company or a Commercial Cardholder makes a payment through a phone call to Bank.

    Pricing Information may be changed from time to time through disclosures posted on Bank's website or otherwise made available to Company.

    When a Commercial Cardholder uses an ATM not owned by Bank, there may be a fee charged by the ATM operator, Bank or by any network used to complete a Transaction, and/or a fee may be charged for a balance inquiry (even if any other transaction is not completed).

    Unless otherwise arranged with Bank, any late payment, returned check, or payment by phone will be added to the Commercial Cardholder's Purchase balance and be treated as a Purchase.

16. **Default.** Company will be in default if:

    (1) Company fails to comply with this Agreement or a Commercial Cardholder fails to comply with the Commercial Cardholder Agreement,

    (2) Company fails to meet any other obligations to Bank, howsoever arising (i.e., whether related or unrelated to this Agreement or the Account), including, but not limited to any other obligations Company has to Bank, as borrower, guarantor, pledgor, grantor or in any other capacity, under any note, account agreement, guaranty, business loan agreement, commercial security agreement, deed of trust or other loan document or credit agreement,

    (3) the occurrence of an event or circumstance comprising a default in the payment or performance of any term or condition of any credit agreement, note, security agreement, mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other indebtedness, liabilities or obligations of Company,

    (4) a petition for bankruptcy, insolvency, receivership, or similar protection is filed by or against Company or any Commercial Cardholder,

    (5) in any period, Bank does not receive the amount due by the Payment Due Date for any Commercial Card,

    (6) any Commercial Cardholder exceeds his or her credit line or Company's overall credit line is exceeded,

    (7) Company is dissolved, consolidated or merged, or a change in control of the ownership of Company or any of its affiliates occurs,

    (8) any guarantor of this Agreement becomes insolvent, dies or becomes incompetent, or revokes or disputes the validity of, or liability under any guaranty of indebtedness that includes this Agreement,

    (9) any guarantor of this Agreement fails to comply with any term, obligation, covenant or condition contained in its guaranty, or

    (10) Bank believes in good faith that the payment or performance of Company's or any Commercial Cardholder's obligations to Bank is impaired for any reason.

    If Company or any Commercial Cardholder is in default, Bank may, at its option, restrict some or all further Account activity. Bank may also, at its option, demand immediate payment of the full balance of the Account and take any available legal action. If Company or any Commercial Cardholder is in default and fails to pay any amount owed, Company will be liable for Bank's collection costs and, if the claim is referred to an attorney for collection, Company will also be liable for any reasonable attorney fees which are incurred, plus the costs and expenses of legal action. Nothing herein shall limit Bank's right to terminate any or all Account privileges as otherwise provided in this Agreement. Bank will not be obligated to honor any attempted use of any Commercial Card if a default has occurred under this Agreement or under or if Bank has decided to suspend or terminate the Commercial Card or Account privileges.

17. **Liability.** Company shall be liable for all Purchases, fees, Cash Advances and other charges incurred or arising by virtue of the use of the Account whether or not authorized. The Program Administrator shall notify Bank by telephone (with written confirmation) of the termination of employment of any Commercial Cardholder or any lost or stolen Commercial Card. Based upon Standard Industry Classifications ("SIC")

or Visa® Merchant Category Codes ("MCC") and as agreed to by Company, Bank shall consider requests to establish charge authorization procedures in order to cause certain Transactions to be refused or denied. Bank may monitor Account activity in order to assist Company in detecting Transactions which are outside of usage procedures established by Company or Authorized Officer; provided, Company will bear any incremental costs borne by Bank to monitor Transaction activity and assist Company in detecting such Transactions, including allocated cost of personnel needed to administer such functions, and provided that Bank shall have no liability regarding any failure or alleged failure on its part to detect any Transactions which are outside of usage procedures established by Company or otherwise unauthorized or improper.

18. **Billing Disputes.** Disputes regarding charges or billings in connection with the Account shall be communicated in writing to Bank at the address indicated in Section 19. Oral communications with Bank regarding disputed charges or billings may not preserve Company's rights. Communications should include the Commercial Cardholder name and account number related to the Commercial Card, the dollar amount of any dispute or suspected error, the reference number and a description of the dispute or error. Any communication regarding a dispute or suspected error must be received by Bank within sixty (60) days of the date of the Billing Statement on which the disputed or incorrect charge first appeared or Company will be deemed to have accepted them and waived any objection to them. Disputed billings are categorized as, but not necessarily limited to, failure to receive goods or services charged, fraud, forgery, altered charges, unauthorized charges, disputes as to the quantity or quality of goods or services purchased with a Commercial Card, and billing errors on the Periodic Statement. Company and the Commercial Cardholder are responsible for handling any dispute directly with the merchant that accepted or refused to accept a Commercial Card. Company may not assert disputes with a merchant against Bank. Any such dispute is solely between Company and the Commercial Cardholder and the merchant, and Company and the Commercial Cardholder must still pay the total amount of the sales draft plus any appropriate charges Bank may be authorized to make. Bank will investigate disputes and billing errors, and may, in its sole discretion, attempt to facilitate their resolution or correction, but Bank will not be responsible for resolving or correcting them.

19. **Notice and Communication.** Billing Statements will be sent to Company at the physical address shown in Bank's files or by an electronic statement to the email address for Company shown in Bank's files. Bank can provide any notice required under this Agreement or required by law at the physical address for Company shown in Bank's files, through electronic notice given to any email address for Company provided to Bank, or by telephone at any telephone number for Company provided to Bank. Such notices may refer to a link on Bank's website and Company agrees to access such link and read the content on the webpage to which it is directed, or contact Bank to receive a hardcopy of such notification. Company agrees to inform Bank promptly in writing of any change in physical address, email address or telephone number. Bank may, in its discretion, accept address corrections from the United States Postal Service. All notices, requests and other communication from Company to Bank must be directed to: Umpqua Bank, LB1181, PO Box 35142 Seattle, WA 98124-5142, or by calling 1-866-777-9013. If Company has a dispute with Bank, contacting Bank verbally may not preserve Company's rights.

20. **Internet Access and Account Information.** Bank may permit access to certain information regarding the Account via the internet and may provide certain advance reporting regarding the Account. Such internet access and advance reporting may be subject to additional terms and conditions that will be displayed upon initial login, and Company hereby agrees to be bound thereby. Bank may, in its sole discretion, at any time and without prior notice, discontinue providing such internet access and/or such advance reporting or elect to assess certain fees (or increase such fees) in connection with providing such access or such advance reporting. BANK SPECIFICALLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO ANY INTERNET ACCESS OR ADVANCE REPORTING (REGARDLESS OF WHETHER ANY FEE IS ASSESSED), INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY INTERNET ACCESS AND/OR ADVANCE REPORTING IS PROVIDED "AS IS," "WHERE IS" AND WITHOUT RECOURSE TO BANK. If Bank elects to provide Company access to certain information regarding the Account via the internet or provides any advance reporting regarding the Account, Company will be responsible for any configuration, system programming, or other compatibility issues associated with obtaining such access or receiving or utilizing such reports, and Company agrees to accept full liability for any changes made to the Account using such internet services.

21. **Proprietary Information.** Bank considers the Commercial Card program to be a unique service involving Bank's proprietary information. Company agrees that Commercial Card program reports, manuals, documentation (including, without limitation, this Agreement) and related materials will not be used or disclosed other than as necessary to participate in the Commercial Card program, and to take reasonable steps to safeguard the confidentiality of such proprietary information.

22. **Renewal; Termination.**
    (a) Following the expiration of the Initial Term, this Agreement will automatically renew for successive Renewal Terms unless either Party provides notice of non-renewal at least ninety (90) days prior to the end of the then-current term or unless earlier terminated pursuant to this Section 22.
    (b) At any time without cause, either party may terminate this Agreement upon ninety (90) days prior written notice; provided, however, that if Company terminates this Agreement pursuant to this Section 22(b), Company shall pay an amount equal to (i) $5,000 if terminated during the first six months of the Initial Term or $2,500 if terminated during the sixth through eighteenth month of the Initial Term, plus (ii) a pro rata portion (based on the number of months remaining in the Initial Term at termination divided by the total number of months in the Initial Term) of any signing bonus, incentive or rebate provided to Company upon commencement of this Agreement.
    (c) Bank may immediately terminate this Agreement if Company fails to pay any amount due hereunder, is in default or otherwise breaches any of its obligations hereunder.
    (d) All Commercial Cards and related Accounts shall be deemed canceled effective upon termination of this Agreement.

    Upon termination of this Agreement, Company shall instruct all Commercial Cardholders to immediately destroy and cease use of the Commercial Cards. Company and the Commercial Cardholders shall remain liable for all purchases, fees and other charges incurred or arising by virtue of the use of a Commercial Card prior to the termination date.


Bank shall have the right to suspend all services and obligations under this Agreement in the event that the amount due from Company, as the result of Purchases, fees, Cash Advances and other such charges, exceeds the credit limit established by Bank.

Upon termination of this Agreement, all amounts outstanding under the Account shall be immediately due and payable, without further demand or notice.

The provisions of this Agreement shall survive termination of this Agreement as their context may naturally dictate.
Notwithstanding the foregoing or any other provision in this Agreement, Bank may limit, suspend, or terminate Company's privileges under this Agreement or the privileges of any Commercial Cardholder under a Commercial Cardholder Agreement (and list the Commercial Card and the Account in warning directories) at any time without notice or liability.

23. **Credit Worthiness.** Bank reserves the right to:
   (a) Determine the creditworthiness of Company periodically by obtaining financial statements from Company;
   (b) Determine the appropriate maximum credit limit under the Account and the appropriate maximum credit limit for each Commercial Cardholder;
   (c) Request a guaranty of payment, pledge of collateral, or other similar security from Company or its subsidiaries or affiliates based on the review of Company financial statements;
   (d) Approve or decline the issuance, renewal, or replacement of a Commercial Card to any person in Bank's sole discretion; and
   (e) Cancel, suspend or limit spending on any Commercial Card at any time for any reason or no reason, subject to the notice requirements set forth in Section 22 of this Agreement.
24. **Warranties.** Company warrants that:
   (a) This Agreement constitutes a valid, binding and enforceable agreement of Company;
   (b) The execution and delivery of this Agreement and the performance of its obligations under this Agreement are within Company's powers; have been duly authorized by all necessary action; and do not constitute a breach of any agreement of Company with any party;
   (c) The execution of this Agreement and the performance of its obligations under this Agreement will not cause a breach by Company of any duty arising in law or equity or otherwise; and
   (d) Company is solvent and possesses the financial capacity to perform all of its obligations under this Agreement.

   Failure of any of the above representations and warranties to be true and correct in all respects during the term of this Agreement shall constitute a breach of this Agreement, and Bank will have the right, upon notice to Company, to immediately terminate this Agreement and all amounts outstanding hereunder shall be immediately due and payable, without further demand or notice.

25. **Collateral**. This Agreement shall be secured by any and all personal property granted to Bank under any security agreement securing other indebtedness owed by the Company to Bank, except for titled vehicles and Company hereby grants Bank a security interest in the personal property described in such security agreements to secure all obligations of Company under this Agreement. However, in no event shall the obligations of the Company under this Agreement be secured by real property.

26. **Financial Information.** Bank may elect to defer to Financial Information contained within an active commercial borrowing agreement between the Company and Bank. If Company does not have an existing commercial borrowing agreement with Bank, then Company shall deliver to Bank as soon as available, and in any event not later than one hundred and twenty (120) days after the end of each fiscal year of Company, Company's audited financial statements prepared by independent certified public accountants selected by Company. If audited financials are not available, Bank, in its sole discretion, may accept reviewed or prepared financial statements. Company further agrees to provide to Bank from time-to-time, such other information regarding the financial condition of Company as Bank may reasonably request. Company hereby authorizes Bank to request credit reports in connection with the issuance and use of the Commercial Cards. Information concerning Company's credit history with Bank may be furnished to consumer reporting agencies or others who may properly receive that information.

27. **Unauthorized Transactions.** Bank assumes no responsibility to discover or audit any possible breach of security or unauthorized disclosure or use of any Commercial Cards or personal identification numbers or codes (PINs). Company will promptly notify Bank of any actual or suspected breach of security or unauthorized activity involving the Commercial Cards or the Account (whether or not involving employees of Company). Company must establish, maintain, and follow commercially reasonable security procedures regarding the Commercial Cards and the Account.

28. **Trademarks.** Company and Bank each recognize that they have no right, title or interest, proprietary or otherwise, in or to the name or any logo, copyright, service mark or trademark owned or licensed by the other party. Company and Bank each agree that, without prior written consent of the other party, they will not use the name or any name, logo, copyright, service mark or trademark owned or licensed by the other party.

29. **Amendment.** Bank can amend this Agreement at any time upon notice to Company. Subject to the requirements of applicable law, any amendments to this Agreement will become effective at the time stated in the notice to Company and unless specified otherwise, the amended terms of this Agreement will apply to all outstanding unpaid indebtedness in the Account as well as new Transactions. Use of any Commercial Card by a Commercial Cardholder after the effective date of the change constitutes acceptance of the change. Company shall have no right to amend this Agreement without the prior written consent of Bank.

30. **Interpretation.** The section headings shall in no way be held to explain, modify, or aid in the interpretation of the provisions hereof. Wherever


possible, each provision will be interpreted in a manner as to be valid, legal, and enforceable under applicable law. If any provision is declared invalid, illegal, or unenforceable in any jurisdiction, it shall be modified to render it valid, legal, and enforceable in the manner that best advances the spirit of this Agreement and/or such provision shall be deemed deleted, as the subject court or arbitrator(s) shall determine, and the remaining provisions will continue in full force and effect in the subject jurisdiction. The rule of construing ambiguities against the drafter shall not apply.

31. **Non-Waiver.** Bank can accept late payments, partial payments, checks and money orders marked "Paid in Full" or similar language purporting to have the same effect without losing or in any way impairing any of Bank's rights. Bank can also delay enforcing its rights for any length of time and for any number of times without losing or in any way impairing those or any other rights. The fact that Bank may at any time honor a Purchase or Cash Advance in excess of a credit line does not obligate Bank to do so again, nor does it waive any of Bank's rights or remedies regarding any breach of this Agreement. Without limiting the foregoing, the delay or failure of Bank to exercise any right, power or option, or to insist upon strict compliance with any term of this Agreement, shall not constitute a waiver of that or any other right, power, option, or term of this Agreement, nor a waiver of that or any other breach thereof, nor a waiver of Bank's right at any time thereafter to require strict compliance with that or any other term hereof. No waiver shall be effective against Bank unless it is expressly stated in a writing signed by Bank.

32. **Survivability of Payment Obligations, Rights and Remedies.** The obligation of Company to make payments as herein set forth shall continue until fully performed. Rights, obligations or liabilities that arise prior to the suspension or termination of this Agreement shall survive the suspension or termination of this Agreement, including any rights Company or Bank may have with respect to each other arising out of either party's performance of services or obligations prior to the expiration or termination of this Agreement.

33. **DISCLAIMER.** BANK MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SERVICES PROVIDED TO COMPANY OR ANY COMMERCIAL CARDHOLDER WITH RESPECT TO THE ACCOUNT, THE COMMERCIAL CARDS, THIS AGREEMENT OR ANY COMMERCIAL CARDHOLDER AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ALL BANK SERVICES ARE PROVIDED "AS IS," "WHERE IS" AND WITHOUT RECOURSE TO BANK.

34. **LIMITATION OF LIABILITY.** TO THE EXTENT SUCH LIMITATION OF LIABILITY IS PERMITTED BY LAW, (i) BANK WILL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR EXEMPLARY DAMAGES OR LOSSES, WHETHER OR NOT FORESEEABLE, (ii) BANK WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE ARISING DIRECTLY OR INDIRECTLY FROM OR IN CONNECTION WITH ANY INACCURACY, ACT OR FAILURE TO ACT ON THE PART OF ANY PERSON NOT WITHIN BANK'S REASONABLE CONTROL, OR ANY ERROR, FAILURE, OR DELAY IN EXECUTION OF ANY TRANSACTION RESULTING FROM CIRCUMSTANCES BEYOND BANK'S REASONABLE CONTROL, INCLUDING, BUT NOT LIMITED TO, ANY INOPERABILITY OF COMMUNICATIONS FACILITIES OR OTHER TECHNOLOGICAL FAILURE, AND (iii) BANK WILL NOT BE LIABLE FOR ANYTHING RELATING TO THE ACCOUNT, COMMERCIAL CARDS OR THIS AGREEMENT EXCEPT TO THE EXTENT DIRECTLY ARISING AS A RESULT OF BANK'S OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. PROVIDED BANK HAS COMPLIED WITH ITS OBLIGATIONS UNDER THIS AGREEMENT, AND SUBJECT TO APPLICABLE LAW, COMPANY AGREES TO INDEMNIFY, DEFEND, AND HOLD BANK HARMLESS AGAINST ANY THIRD PARTY CLAIM ARISING FROM, OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, ANY USE OF ANY COMMERCIAL CARD, THE ACCOUNT, THIS AGREEMENT, OR ANY RELATED SERVICE PROVIDED BY BANK.

35. **Governing Law.** This Agreement, the Account and all Commercial Cards will be controlled by and construed and enforced under the laws of the State of Washington without regard to Washington's conflict of laws principles (i.e., as applicable to agreements made and performed in Washington) and, as applicable, Federal law.

36. **Venue.** If there is a dispute or issue relating to the Account or to this Agreement, the location of the court proceeding will occur in the state where Company opened the Account and the county will be chosen by Bank in its sole discretion.

37. **Assigns & Successors.** Company may not assign, in whole or in part, any Commercial Card, the Account, or this Agreement to any other person or entity. Bank may at any time assign, in whole or in part, the Account, any sums due under the Account, or this Agreement to any person or entity. The person or entity receiving any such assignment shall succeed to Bank's rights and obligations under this Agreement to the extent assigned. Except as otherwise provided herein, this Agreement shall be binding upon the parties' successors and assigns.

38. **Remedies.** Except where a remedy is expressly stated to be exclusive, the remedies herein provided are cumulative and not exclusive of any remedies provided herein or otherwise, at law or in equity. To the extent permitted by applicable law, Bank reserves a right of setoff in all Company's accounts with Bank (whether checking, savings or other), including all existing accounts and all such accounts that may be opened in the future. Company authorizes Bank, to the extent permitted by applicable law, to charge or setoff all sums owing under the Account against any and all such accounts, and, at Bank's option, to administratively freeze all such accounts to allow Bank to protect Bank's charge and setoff rights provided in this Section, at law or otherwise.

39. **Entire Agreement.** This Agreement, along with the related credit application documents, Commercial Cardholder Agreements, and other related agreements, is the entire agreement between the parties hereto regarding the subject matter and supersedes any oral agreements, oral representations, or oral warranties relating thereto.

40. **Confidentiality.** Bank may disclose information to third parties about the Account and/or the Transactions in order to process Transactions or otherwise perform Bank's obligations under this Agreement, to verify the existence and condition of the Account for a third party (such as a credit bureau or merchant), to comply with government agency or court orders, or in accordance with written permission granted by Company.

MEMBER
FDIC
EQUAL HOUSING
LENDER



**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**





## PRICING INFORMATION

| | | |
|---|---|---|
| **Interest Rates and Interest Charges** | Purchase Annual Percent Rate (APR) | A fixed APR, currently 21.99%. |
| | Cash Advance APR | A fixed APR, currently 23.99%. |
| | Balance Calculation Method | Average Daily Balance (Including new purchases). |
| | Minimum Interest Charge per Billing Cycle | $1.00 unless Average Daily Balance for combined Purchases and Cash Advances is zero. |
| | Payment Due Date | Bank will not charge interest on purchases if the entire balance is paid by the due date as outlined below. Interest on balance transfers, cash advances, and overdraft advances will begin on the transaction date.<br><br>*Monthly Cycles*: The due date as shown on the Periodic Statement will be a minimum of 25 days after the close of each billing cycle. *Weekly or Bi-weekly Cycles*: The due date as shown on the Periodic Statement will be 5 days after the close of each billing cycle. Automatic payment required.<br><br>*Daily Settlement* requires automatic payment of daily balances with no grace period. |
| **Fees** | Annual Fee | Umpqua Commercial One Card: No Fee.<br>Umpqua Visa Commercial Preferred Solution: $525. |
| | Balance Transfer | Not available. |
| | Cash Advance | Either $15 or 5% of the amount of each transaction, whichever is greater. |
| | International Transaction | 2.00% of transactions made outside the U.S., in either foreign currency or U.S. Dollars, using an Umpqua Bank card. |
| | Late Payment | $15 if the balance is less than $100.<br>$35 if the balance is $100 or more. |
| | Payment by Phone | $10 |
| | Return Payment | $35 |
| | Return Check | $35 |
| | Custom Card Design Fee | $500 one-time setup fee.<br>(Waived with minimum $2MM annual spend) |
| | Expense Management Fees | Visa Spend Clarity for Enterprise<br>$1,500 one-time setup fee.<br>$100 monthly maintenance fee.<br>(Fees only apply when opting into Visa Spend Clarity) |
| | Reporting and Data Transfer Fees | Determined based on client's file and data requirements |

The information listed above is correct as of November 1, 2024, and is subject to change at any time without prior notice.
To receive the most recent information, please write to Umpqua Bank, LB1181, PO Box 35142, Seattle, WA 98124-5142 or access Bank's website at www.umpquabank.com/disclosures.



# Commercial Card Account Agreement

| COMPANY ______ | | UMPQUA BANK |
|---|---|---|
| AUTHORIZED SIGNER | AUTHORIZED SIGNER | |
| SIGNATURE | SIGNATURE | ASSOCIATE SIGNATURE |
| PRINT NAME | PRINT NAME | ASSOCIATE NAME |
| TITLE | TITLE | ASSOCIATE TITLE |
| DATE | DATE | DATE |

*This agreement requires a minimum of one (1) signature by an authorized signer of Company. Any and all signers must be authorized to sign on behalf of Company.*

MEMBER FDIC EQUAL HOUSING LENDER

 # Commercial Card Assignment of Account

**THIS BUSINESS ASSIGNMENT OF ACCOUNT** ("Agreement") is made as (date), by: ("Grantor") whose address is in favor of: Umpqua Bank ("Lender") at 111 N. Wall St., Spokane, WA 99201.

Whereas, Lender has agreed to issue, or has issued, subject to the terms and conditions hereof, certain commercial cards ("Commercial Cards"), issued pursuant to that certain Commercial Card Account Agreement dated as of August 5, 2019 (the "Card Agreement")

Whereas, as security for performance of all of the obligations under the Card Agreement and the use of the Commercial Cards, Grantor is required by Lender to assign its interest in certain deposit and / or line of credit accounts.

Now, therefore, Grantor and Lender agree as follows:

**ASSIGNMENT**. For valuable consideration, Grantor assigns and grants to Lender a security interest in the Collateral, including, without limitation, the deposit and / or line of credit accounts described below, to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION**. The word "Collateral" means the following described deposit and / or line of credit account(s) (collectively, the "Account"):

Account number together with (A) all interest, whether now accrued or hereafter accruing; (B) all additional deposits hereafter made to the Account; (C) any and all proceeds from the Account and (D) all renewals, replacements and substitutions for any of the foregoing.

**BLOCKED ACCOUNT**. The Account will be a blocked account at the Bank. Unless and until the Card Agreement has been terminated and the Indebtedness has been paid in full, Grantor shall not be entitled to make any withdraws, debits, draws, or otherwise remove funds from the Account.

**RIGHT OF SETOFF**. To the extent permitted by applicable law, Lender reserves a right of setoff in the Account. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against the Account, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL**. With respect to the Collateral, Grantor represents and promises to Lender that:

- **Ownership**. Grantor is the lawful owner of the Collateral free and clear of all loans, liens, encumbrances and claims except as disclosed to and accepted by Lender in writing.
- **Right to Grant Security Interest**. Grantor has the full right, power and authority to enter into this Agreement and to assign the Collateral to Lender.
- **No Prior Assignment**. Grantor has not previously granted a security interest in the Collateral to any other creditor.
- **No Further Transfer**. Grantor shall not sell, assign, encumber or otherwise dispose of any of Grantor's rights in the Collateral except as provided in this Agreement.
- **No Defaults**. There are no defaults relating to the Collateral and there are no offsets or counterclaims to the same. Grantor will strictly and promptly do everything required of Grantor under the terms, conditions, promises and agreements contained in or relating to the Collateral.


- **Proceeds**. Any and all replacement or renewal certificates, instruments or other benefits or proceeds related to the Collateral that are received by Grantor shall be held by Grantor in trust for Lender and immediately shall be delivered by Grantor to Lender to be held as part of the Collateral.
- **Validity; Binding Effect**. This Agreement is binding upon Grantor and Grantor's successors and assigns and is legally enforceable in accordance with its terms.
- **Financing Statements**. Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect and continue Lender's security interest in the Property. This includes making sure Lender is shown as the first and only security interest holder on the title covering the Property. Grantor will pay all filing fees, title transfer fees and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**LENDER'S RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLLATERAL**. While this Agreement is in effect, Lender may retain the rights to possession of the Collateral, together with any and all evidence of the Collateral, such as certificates or passbooks. This Agreement will remain in effect until (A) there no longer is any Indebtedness owing to Lender; (B) all other obligations secured by this Agreement have been fulfilled; and (C) Grantor, in writing, has requested from Lender a release of this Agreement.

**LENDER'S EXPENDITURES**. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral, or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Card Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become part of the Indebtedness and, at Lender's option, be payable on demand. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**LIMITATIONS ON OBLIGATIONS OF LENDER**. Lender shall use ordinary reasonable care in the physical preservation and custody of any certificate or passbook for the Collateral, but shall have no other obligation to protect the Collateral or its value. In particular, but without limitation, Lender shall have no responsibility (A) for the collection or protection of any income on the Collateral; (B) for the preservation of rights against issuers of the Collateral or against third persons; (C) for ascertaining any maturities, conversions, exchanges, offers, tenders or similar matters relating to the Collateral; nor (D) for informing the Grantor about any of the above, whether or not Lender has or is deemed to have knowledge of such matters.

**DEFAULT**. Each of the following shall constitute an Event of Default under this Agreement:


- **Payment Default**. Grantor fails to make any payment when due under the Indebtedness.
- **Environmental Default**. Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Indebtedness.
- **Other Defaults**. Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.
- **Default in Favor of Third Parties**. Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.
- **False Statements**. Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished, or becomes false or misleading at any time thereafter.
- **Defective Collateralization**. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.
- **Creditor or Forfeiture Proceedings**. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender.
- **Adverse Change**. A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.
- **Insecurity**. Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT**. Upon the occurrence of an Event of Default, or at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any rights or remedies that may be available at law, in equity, or otherwise:

- **Accelerate Indebtedness**. Lender may declare all Indebtedness of Grantor to Lender immediately due and payable, without notice of any kind to Grantor.
- **Application of Account Proceeds.** Lender may take directly all funds in the Account and apply them to the Indebtedness. If the Account is subject to an early withdrawal penalty, that penalty shall be deducted from the Account before its application to the Indebtedness, whether the Account is with Lender or some other institution. Any excess funds remaining after application of the Account proceeds to the Indebtedness will be paid to Grantor as the interests of Grantor may appear. Grantor agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Account to the Indebtedness. Lender also shall have all the rights of a secured party under the Uniform Commercial Code, even if the Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party shall nonetheless be a part of this Agreement.


- **Transfer Title**. Lender may effect transfer of title upon sale of all or part of the Collateral. For this purpose, Grantor irrevocably appoints Lender as Grantor's attorney-in-fact to execute endorsements, assignments and instruments in the name of Grantor and each of them (if more than one) as shall be necessary or reasonable.
- **Other Rights and Remedies**. Lender shall have and may exercise any or all of the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, at law, in equity, or otherwise.
- **Deficiency Judgment**. If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.
- **Election of Remedies**. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.
- **Cumulative Remedies**. All of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and to exercise its remedies.

**FRAUD DISCLOSURE**. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.

**MISCELLANEOUS PROVISIONS**. The following miscellaneous provisions are a part of this Agreement:

- **Amendments**. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.
- **Attorneys' Fees; Expenses**. Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.
- **Caption Headings**. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.
- **Governing Law**. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its


conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.

- **Choice of Venue**. If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Spokane County, State of Washington.
- **Preference Payments**. Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.
- **No Waiver by Lender**. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.
- **Notices**. Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.
- **Power of Attorney**. Grantor hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (1) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (2) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (3) to settle or compromise any and all claims arising under the Collateral, and in the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (4) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender.
- **Waiver of Co-Obligor's Rights**. If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.


- **Severability**. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.
- **Successors and Assigns**. Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and enure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.
- **Survival of Representations and Warranties**. All representations, warranties and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.
- **Time is of the Essence**. Time is of the essence in the performance of this Agreement.
- **Waive Jury**. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding or counterclaim brought by any party against any other party
- **DEFINITIONS**. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:
    - **Account**. The word "Account" means the deposit and/or line of credit accounts described in the "Collateral Description" section.
    - **Agreement**. The word "Agreement" means this Business Assignment of Account, as this Business Assignment of Account may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Assignment of Account from time to time.
    - **Borrower**. The word “Borrower” means  and includes all co-signers and co-makers signing the Card Agreement and all their successors an assigns.
    - **Collateral**. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.
    - **Default**. The word "Default" means the default set forth in this Agreement in the “Default” section.
    - **Event of Default**. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.
    - **Grantor**. The word “Grantor” means        .
    - **Indebtedness**. The word "Indebtedness" means the indebtedness evidenced by the Card Agreement and the Commercial Cards or Related Documents, including all principal


and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

- **Lender**. The word "Lender" means Umpqua Bank, its successors and assigns.
- **Property**. The word "Property" means all of Grantor's right, title and interest in and to all the property as described in the Collateral Description section of this Agreement.
- **Related Documents**. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness, including association agreements from entities such as Visa and Mastercard.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF BUSINESS ASSIGNMENT OF ACCOUNT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF THE DATE SET-FORTH ABOVE. THE UNDERSIGNED CERTIIFES THAT HE/SHE IS DULY AUTHORIZED TO EXECUTE THIS AGREEMENT ON BEHALF OF THE ENTITY DEFINED AS "GRANTOR."

GRANTOR _____

SIGNATURE OF GRANTORS

| X ______________________ | X ______________________ |
|---|---|
| NAME | NAME |
| TITLE | TITLE |
| DATE | DATE |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date listed below, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will in turn automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system. The Notice of Electronic Filing specifically identifies the recipients of electronic notice.

DATED: July 31, 2025.

STOEL RIVES LLP

*/s/ John S. Kaplan*

John S. Kaplan, WSBA No. 23788
Bryan T. Glover, WSBA No. 51045
Brandon E. Lira, *Pro Hac Vice*
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
Email: john.kaplan@stoel.com
bryan.glover@stoel.com
brandon.lira@stoel.com

*Attorneys for Debtor*