JAMES L. DAY, WSBA #20474
JASON WAX, WSBA #41944
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101-2373
Tel: (206) 292-2110
Emails: jday@bskd.com;
jwax@bskd.com

HONORABLE WHITMAN L. HOLT

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF CLE ELUM, | No. 25-01128-WLH |
| Debtor. | OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR |

This case presents an entirely unique set of facts and circumstances that wholly distinguishes it from and makes inapplicable case law the City of Cle Elum (the "City" or the "Debtor") will doubtless seek to lean on as support for its eligibility. No other municipality in any reported case has so exclusively been the cause of its financial distress, nor has any other treated its obligations as a prospective chapter 9 debtor with such casual disregard.

City Heights Holdings, LLC ("CHH") objects to the Debtor's eligibility to qualify for relief under chapter 9 of the Bankruptcy Code, as there is no basis for a finding that the Debtor commenced this case in good faith under Bankruptcy Code section 921(c). This case should be dismissed.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

This Objection is based upon the files and records here, and the accompanying *Declaration of Sean Northrop in Support of Objection of City Heights Holdings, LLC, to City of Cle Elum's Eligibility to Be Chapter 9 Debtor* (the "Northrop Objection").

## I.  INTRODUCTION

There are two fundamental distinctions between this case and the facts and circumstances present in every other chapter 9 reported decision. First, the Debtor is the sole author and exclusive cause of its financial difficulties. Unlike here, most every other chapter 9 debtor has been beset by multiple and significant external influences or long-standing structural issues occurring over a period of years that eventually led to a financial crisis. Skyrocketing employee pension plan obligations, macro-economic shocks, crumbling infrastructure, declining populations and other economic challenges have each led to a city's growing inability to maintain critical services.

In sharp contrast, the Debtor's singular financial challenge did not come from any event or circumstance over which the Debtor had no control or influence. Nor is this the case of a simple breach of contract by the Debtor.  Rather, the Debtor intentionally, serially and comprehensively breached a development agreement it had entered into with CHH, ultimately causing significant damages to CHH and despite having numerous opportunities to avoid the very consequences it faces now. In two separate prepetition arbitration proceedings, the arbitrator, a retired Superior Court judge, rejected each of the Debtor's proffered excuses for its continued violations of the development agreement, and both times ordered it to comply. Undaunted, the Debtor continued to breach and ignore its obligations under the development agreement, leading to a third arbitration at which CHH sought damages for the first time. After the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

Debtor once again had a full opportunity to present its case, the arbitrator entered an award in favor of CHH that has a present balance of approximately $26 million. The Debtor can point to no cause for its financial challenges other than its own bad faith, defiance and arrogance.

The Debtor's defiant attitude continued even after the arbitration award was entered, and led to the second way this case finds itself in uncharted territory: believing it was merely the victim of the unjustified caprice of a renegade arbitrator, the Debtor did virtually nothing to avoid this filing. Other cities that have sought chapter 9 protection (Stockton, Detroit, Vallejo to name three) have scoured their budgets seeking cost reductions; negotiated – and sometimes imposed – concessions from unions and non-union employees on both wages and benefits; delayed, scaled back or eliminated non-essential projects; reduced employment levels; engaged outside city management professionals, and over a period of years comprehensively did all that they could wherever they could to avoid the need for a chapter 9 filing.

In contrast, the Debtor admits it did virtually nothing in the seven months between entry of the Judgment (as defined below) and the filing of this case. Deposition testimony of the Mayor, members of the City Council and the City Manager confirm that it was business as usual at the Debtor, that no steps were taken to identify costs that could be reduced or eliminated, and little was done to identify and add additional revenue opportunities. All the Debtor can point to is that it nominally participated in mediation sessions prior to its filing. At the last of these, the parties were so close to a settlement that the mediator took it upon himself to prepare and circulate a draft settlement agreement reflecting the parties' last positions. Rather than continuing

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR– Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

25-01128-WLH9   Doc 80   Filed 03/02/26   Entered 03/02/26 17:43:08   Pg 3 of 22

to work with the mediator and CHH towards a solution that would have eliminated the need for this filing, the Debtor commenced this case less than a week later.

The Debtor cannot satisfy eligibility requirements, for the simple reason that it cannot establish that – at any time – it has acted in good faith for purposes of Bankruptcy Code § 921(c).  In this two-party dispute (all other creditors are being paid currently), the Debtor has alternatively treated the Judgment as if it was merely pending litigation in which both liability and damages remained open issues, or that the dollars it owes are simply Monopoly money not worthy of any significant effort to create an ability to pay.

As will be shown, the Debtor's conduct prior to filing its case was woefully short of the good faith standard that is a prerequisite to such a filing.

## II.  BACKGROUND FACTS

### A.  The Debtor's Prejudgment Bad Faith

In 2011, the Debtor and CHH entered into a development agreement (the "DA"), which authorizes a master planned community for approximately 950 homesites situated on 358 acres in (prior to the DA) unincorporated Kittitas County (the "Property"). From the Debtor's perspective, one of the DA's critical components on which the Debtor insisted was to annex the Property into the Debtor. That annexation will lead to significant increases in the Debtor's tax base once houses are built and sold. *Northrop Declaration,* ¶ 2.

The DA has a 25-year term and, because the agreement was entered into following the collapse of the real estate market, provided CHH with absolute discretion as to when development activities would commence.  When CHH commenced

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 4

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

development activities in 2019, the Debtor had extreme buyer's remorse, deeming the DA "outdated, one-sided and incomplete." *See Northrop Declaration,* Exhibit A (the "Arbitration Award") at 2. The Debtor attempted to unilaterally add new conditions to the agreement and otherwise began breaching its obligations under the DA almost immediately. *Id.* This eventually led to an initial arbitration between the parties before Judge Paris Kallas, a retired King County Superior Court judge, at which Judge Kallas rejected each of the Debtor's contentions and directed it to comply with the terms of the DA. *Id.*

The Debtor ignored the arbitration order and continued to violate the terms of the DA.  CHH was forced to return to the arbitrator a second time, who again ruled that the Debtor's arguments and justifications for its actions were baseless and, once again, directed the Debtor to comply with the DA. *Id.*

Undeterred, the Debtor again ignored the arbitrator's orders and continued to violate the DA.  At a third arbitration, CHH sought damages for the first time.  After several days of proceedings, on November 5, 2024, Judge Kallas entered an award in favor of CHH in the amount of $22,230,175.[1]  Judge Kallas determined:

> Having considered the extensive evidence presented, the credibility of witnesses, the argument of counsel, and the governing law, I find that CHH soundly meets its burden of proving that the City persistently breached the Development Agreement. CHH also proves that the City's persistent breach significantly delayed the bargained-for expedited permitting process, thus depriving CHH of the benefits of the Development Agreement. Finally, CHH fully meets its burden of proving the damages caused by the City's breach.

---

[1] Judge Kallas later entered an award in favor of CHH for its attorney fees and costs in the amount of $2,316,548.58, for a total principal judgment of $24,546,723.58.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 5

Bush Kornfeld LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

*Id.* Judge Kallas also determined that the Debtor was solely responsible for the damages that CHH had sustained:

> Also significant, however, is the fact that the City had numerous opportunities since 2019 to reduce the damage caused by its dissatisfaction with the Development Agreement. This is the **third arbitration** between the parties. In both prior arbitrations, the City's interpretation of the Development Agreement was soundly rejected. Rather than change course and become the cooperative partner contemplated by the Development Agreement, the City publicly stated its dissatisfaction with the contract and the City continued its persistent breach of the contract.

*Id.* at 3 (emphasis in original).

Judge Kallas' findings in the Arbitration Award as to the Debtor's pattern of bad faith that led to the Arbitration Award and the Judgment provide informative context for the Debtor's actions and decisions then and since. Here are just a few of Judge Kallas' determinations:

- "[T]he City breached its duties of good faith and fair dealing . . . [in that it] . . . encouraged rather than calmed citizen frustration with the Project [and] failed to educate its citizens regarding the history of the Development Agreement, the extensive public review process already completed, and the numerous benefits to the City. . . [A]t a public meeting with concerned residents, the City publicly mischaracterized (by stating public input and comment was prohibited) and denounced the Arbitration Award. Rather than set the record straight, the City encouraged those residents with financial resources to consider suing CHH. All of this occurred at a public meeting to which the City failed to invite or include CHH." *Id.* at 8.

- "The City also breached its duties of good faith and fair dealing by contacting numerous agencies, without including CHH in the communications, and actively encouraging the agencies to challenge the Development Agreement, while affirmatively misrepresenting the contract's terms as well as CHH's interpretation of the contract.… In these emails, the City affirmatively misrepresents the Development Agreement and the role of state agencies. These are blatant misrepresentations, given the first Arbitration Award that rejected the City's interpretation. The emails are plainly intended to incite

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 6

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

other agencies to challenge the Development Agreement in direct violation of the City's duties of good faith and fair dealing." *Id.* at 8, 9.

The arbitration award was entered on November 5, 2024, and recorded as a judgment (the "Judgment") in King County Superior Court shortly thereafter.

### B. The Debtor's Post-Judgment Bad Faith

Despite its right to commence collection efforts on the Judgment almost immediately, CHH did not do so for several months. Instead, while the Debtor began threatening a chapter 9 filing right from the outset, CHH sought to do what the Debtor itself was statutorily obligated to do if it wished to qualify for chapter 9 relief: Conduct itself in good faith and actively seek to negotiate a means to repay the judgment. CHH's efforts were met with resistance and delay, and a complete absence of any affirmative steps by the Debtor to resolve its challenges. *Northrop Declaration,* ¶ 6.

The Debtor's initial proposal, on December 16, 2024, came in the form of a one-paragraph email from the Debtor's future bankruptcy attorney and proposed annual payments of $250,000 for a period of 15 years. There was no explanation of the basis for the proposal, why that amount was selected, why it remained fixed over time, or why the Debtor deemed it a reasonable offer under the circumstances. There was no inclusion of offsets for fees that CHH would otherwise have to pay in connection with the ongoing development. There was no treatment of potential claims the Debtor holds against third parties in connection with advice that led to the Debtor's refusal to comply with the DA. There was no inclusion of the Debtor's surplus assets that could be sold for value and reduce the amount of the Judgment. There was no provision for increased revenues the Debtor will realize once development activities go forward and houses are

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR– Page 7

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

built and sold, nor through additional or increased revenue sources.  There was no proposal to reduce expenditures in any way to create additional settlement funds.  Finally, there was also no commitment to comply with the DA going forward. *Id.,* ¶ 7.

The Debtor's defiance continued.  At a City Council meeting on January 28, 2025 (less than two months after entry of the Judgment), two resolutions were presented for approval.  The first authorized the filing of a chapter 9 case.  That resolution was passed.  A second resolution would have required that such a filing be deemed the last resort, and that other avenues be followed prior to any bankruptcy filing.  The City Council rejected the second resolution.[2] *Id.,* ¶ 8.

The Debtor and CHH eventually agreed to mediate with Alan Smith of Perkins Coie.  After multiple sessions that were largely unproductive, the Debtor and CHH had a final mediation session on June 16, 2025, with Mr. Smith, which lasted until the evening.  The parties made substantial progress, to the point where the mediator prepared a draft settlement agreement, a step he had not previously taken, and circulated it on June 20, 2025. *Id.,* ¶ 9.

Four days later, on June 24, 2025 (the "Petition Date"), and without any further discussions, the Debtor filed its chapter 9 petition following a City Council meeting at which all council members voted to approve the filing – even those who attended the June 16 mediation and participated in the negotiations leading to the draft settlement agreement.  The June 16 mediation session was little more than the Debtor's attempt to

---

[2] An unofficial transcript of Councilman Ken Ratliff's prepared remarks at the January 28, 2025 meeting in support of the chapter 9 resolution is attached as Exhibit B to the Northrop Declaration.  The court will note that Mr. Ratliff spends much of his remarks (i) blaming Judge Kallas for the City's problems, (ii) equating payment of the Judgment to public financing of a private project, and (iii) repeating several times that the City's finances – with one exception – were in excellent shape.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 8

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

"check a box" in a shameful but futile attempt to satisfy an eligibility requirement. *Id.,* ¶ 10.

**C. The Debtor's Postpetition Confirmation of its Prepetition Bad Faith.**

The Debtor's refusal to acknowledge its actions and their consequences continued after filing this case, at a time when the Debtor should have at least been pretending to be acting in good faith. The Debtor's initial filing in this case confirmed the Debtor's prepetition unapologetic defiance, lack of ownership of the challenges it self-created, and comprehensive lack of good faith in the lead-up to the bankruptcy filing.

Three days after the Petition Date, the Debtor filed the *Declaration of Matthew Lundh in Support of Cle Elum's Petition for Relief Under Chapter 9 of the Bankruptcy Code* [ECF No. 12] (the "Lundh Declaration"). The declarant is the Debtor's Mayor. The Lundh Declaration is a treasure trove of historical rewriting, with not a shred of ownership or responsibility for the Debtor's self-inflicted financial challenges:

- In ¶ 24 of the Lundh Declaration, the Mayor summarily describes the treatment of significant proceeds from an insurance settlement that the Debtor should have made a part of a settlement proposal. (In September 2023, the Debtor entered into a settlement of a claim against its pooled insurance coverage based on its prospective liability to CHH (the "CHH Insurance Claim") pursuant to which it received approximately $4.3 million. Not only did the Debtor not advise CHH of this coverage or its proceeds, it did not use a single dollar for its intended purpose.) The Mayor describes the CHH Insurance Claim and effectively admits that the proceeds were not used in an effort to settle CHH's claims but rather were used to fund (and apparently continue to fund) the Debtor's ongoing professional fees defending a course of action the arbitrator had already rejected twice. CHH did not see a penny of it.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

- In ¶¶ 39-55, the Mayor puts forth the Debtor's spin on the events leading up to entry of the Arbitration Award, blaming the Debtor's troubles exclusively on CHH and its "three arbitration demands," "regulatory violations," "litigious nature" and "failure to comport with the dickered terms of the Development Agreement," concluding that it was CHH's "litigation tactics" that led to the arbitration award, and – in the Mayor's view – not any act or omission by the Debtor. The contrast between the Lundh Declaration and Judge Kallas' determinations in the Arbitration Award could not be more stark.

- In ¶¶ 64-70, in another tone-deaf moment the Mayor describes his view of the current status of the City Heights development, criticizing CHH for not completing more of the development by now. This is so despite that (i) Judge Kallas determined that it was the Debtor's years-long refusal to abide by the DA that frustrated and delayed CHH's development of the Property, and (ii) the Debtor's actions caused CHH more than $20 million in damages – and counting. The irony of the Debtor's criticisms is plainly lost on the Mayor.

- Beginning at ¶ 71, the Mayor tries to convince the reader that the Debtor has genuinely sought to settle its disputes, despite having "unknowingly contracted with a litigious partner that has embroiled the Debtor in years of disputes and failed to substantially complete its obligations to the Debtor." ¶ 72. Mr. Lundh claims the Debtor considered, but tabled, the notion of a bankruptcy filing only a month after the Arbitration Award was entered (but some six months prior to any collection activity by CHH) (¶ 75) but then fails to advise that the City Council approved a resolution to file chapter 9 just a month later.

- The Mayor claims the Debtor worked "in earnest" to seek a compromise but fails to advise that (i) the Debtor's notion of a good-faith proposal was fifteen annual payments of only $250,000, without explanation, and (ii) the Debtor made only two token payments on the Judgment prior to bankruptcy, both times conditioned on CHH's agreeing to some concession. ¶ 76.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 10

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

- The Mayor also criticizes CHH for commencing collection efforts (on June 5, not May 28), a full seven months after entry of the Arbitration Award, after having received payments totaling only $60,000 during that period. ¶ 81. By then, the Debtor had conditioned the making of *any* further payments on the parties' entering into a full settlement of all issues, again treating the Judgment as akin to merely pending litigation.

- At ¶¶ 87 and 90, the Mayor states, "It is not the Debtor's fault that CHH claims to lack any financial resources" (Judge Kallas disagreed), and "CHH has proven to be a bad development partner for our citizens."

- Finally, the *piece d'resistance*: The Debtor has long wanted to build a community center, a luxury item under the circumstances and plainly not a vital need. At some point in the past, Kittitas County (the county that includes the Debtor) agreed to contribute $6.5 million to help fund that and another project. However, following the Debtor's bankruptcy filing, the County pulled all its funding. *See Northrop Declaration,* <u>Exhibit C</u>. Undaunted, and continuing with its business-as-usual attitude, the city council decided to push forward on its own and recently voted to propose an increase in the sales tax to provide that funding. *See id.,* <u>Exhibit D</u>. There could be no better illustration of the City's complete lack of prudent judgment, good faith and disinclination to formulate a plan to repay the Judgment than its decision to move forward with a non-essential investment while it sits idle in chapter 9.

Beginning in 2019 and continuing to today, the City has consistently manifested an attitude of defiance and a complete lack of accountability and responsibility for either its serial and willful breaches of the DA or the harm it has caused CHH. It was defiant in the face of its contractual obligations under the DA; it was defiant in response to Judge Kallas' two orders to comply; and it has been consistently defiant as to both its obligations under the Judgment and its good faith obligations as a chapter 9 predicate, not caring that its affirmative actions have caused enormous damages to CHH. Instead, the City began threatening a chapter 9 filing almost immediately after

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

entry of the Judgment, and (as the Lundh Declaration makes clear) to this day still does not have a shred of humility and ownership of its actions or their consequences.

Congress intended chapter 9 to be a last resort for municipalities – a shield against creditor actions – and not a sword to be wielded while doing absolutely nothing to manifest and genuinely proceed with the good faith that is a condition of eligibility for chapter 9 relief. The City has demonstrated that its bad faith in refusing to comply with the DA was not an anomaly, but rather an ingrained mindset that carries forward to today. Notwithstanding the deference a municipal debtor is typically given, if there is a debtor as to which the gatekeeping elements of section 921(c) is intended to apply, this is that debtor.

### III. DISCUSSION

As detailed below, the Debtor's actions – and inactions – prior to filing (and confirmed in the Lundh Declaration) follow a consistent pattern and intention that falls far short of the good faith threshold under section 921(c) that is a prerequisite for chapter 9 eligibility and relief.

**A.    Legal Standard**

Bankruptcy Code section 921(c) grants the court authority to dismiss a chapter 9 petition under circumstances abundantly present here:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR– Page 12

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Section 921(c). By its terms, § 921(c) creates two bases upon which a court may dismiss a chapter 9 petition: if the municipality did not commence its bankruptcy in good faith, or the petition fails to satisfy all other prerequisites for chapter 9 eligibility.[3]

The good faith requirement under § 921(c) serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code. *In re City of Stockton*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013). It is assessed on a case-by-case basis in light of all the facts. *Id*. Relevant considerations in the comprehensive analysis for good faith determination under § 921(c) include (i) whether the municipality's financial problems are of a nature contemplated by chapter 9, (ii) whether the reasons for filing are consistent with chapter 9, (iii) the extent of the municipality's prepetition efforts to address the issues, (iv) the extent that alternatives to chapter 9 were considered, and (v) whether the municipality's residents would be prejudiced by denying chapter 9 relief. *Id*.

**B.    Issues Faced and Actions Taken by Other Municipal Debtors Amply Demonstrate Debtor's Complete Lack of Good Faith**

None of the case law that the Debtor will doubtless seek to rely on will be of any assistance. No case is remotely analogous to this one, in that no other municipal debtor has been so exclusively the cause of its own financial challenges, and then acted with such casual disregard for the prerequisites of chapter 9 eligibility. Because a determination of good faith is dependent upon the facts of a given case, any reliance the

---

[3] It is self-evident that the Debtor cannot satisfy the requirements of § 109(c)(5)(A)-(C). However, because the Debtor stalled and delayed for seven months following entry of the Judgment without materially addressing the outstanding balance, it successfully baited CHH into finally starting collection efforts and thereby gained an argument that it can now satisfy § 109(c)(5)(D). However, anything requiring a determination that the Debtor acted in good faith at any time is well beyond its reach.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 13

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Debtor may place on good faith determinations courts have made in other municipal cases as support for such a determination here will be grossly misplaced.

What follows is a review of the financial challenges faced by, and the prepetition efforts to address them of, the cities of Stockton, Detroit and Vallejo. As will quickly be seen, the facts and circumstances here bear little resemblance to the events in these other municipal bankruptcies.

**1.     City of Stockton[4]**

a.     Challenges Faced. The City of Stockton was beset with enormous challenges coming in from multiple directions that the Debtor here has not remotely experienced. Judge Klein described Stockton as "ground zero" for the macro-economic effects of the subprime mortgage crisis. The city's unemployment rate grew to 22% and property values declined by 50%, leading to significantly reduced revenues from property and sales taxes. Stockton had also optimistically bet on future growth through investments in long-term development initiatives (what the court described as "if you build it, they will come"), to which it committed general funds; when the expected revenues never materialized, the initiatives became an ongoing drain on Stockton's finances. The impact of sharply-reduced revenues was exacerbated by years of over-market compensation for city workers and skyrocketing pension costs, both of which made it difficult to reduce expenses when revenues declined.

b.     Actions Taken. Stockton took multiple, aggressive steps seeking to avoid bankruptcy.  In 2008, it appointed a single city manager to address city finances. In

---

[4] For the discussion that follows, see generally *In re City of Stockton*, 493 B.R 772 (Bankr. E.D. Cal. 2013).

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

2010, the city council approved an action plan and hired an independent manager to implement it. Among the austerity measures, the city implemented an employee furlough plan; eliminated medical benefits for new hires; reduced PTO accruals; partially eliminated "add-ons" (i.e., spiking) that had driven up pension plan obligations; pension age requirements were increased, and calculation of benefits was recast. These and other measures were adopted in connection with both collective bargaining units and with unrepresented employees. Stockton also dramatically reduced its workforce, including a 20 percent reduction in police, 30 percent in fire, 38 percent in public works, 46 percent in the library, and 56 percent in recreation.

Unfortunately, despite these and other measures, Stockton commenced its chapter 9 case in June 2012, after four years of efforts to avoid that outcome.

**2.     City of Detroit[5]**

a.     <u>Challenges Faced</u>.  Detroit's fiscal challenges were a long time in the making, ultimately leading to dwindling revenues and unsustainable expenses. Decades of population and employment decline significantly reduced its tax base. Both income tax and property tax revenues fell significantly, as did state revenue sharing. These long-term revenue losses severely hindered Detroit's ability to fund basic services and fulfill debt obligations. As a result, the city had operating deficits for seven consecutive years prior to filing and an accumulated general fund deficit of approximately $237 million, and projections indicated the accumulated deficit would rise to

---

[5] For the discussion that follows, see generally *In re City of Detroit,* 504 B.R 191 (Bankr. E.D. Mich 2013).

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 15

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

approximately $1.35 billion by 2017. The court found that Detroit would have run out of cash by June 2013, absent extraordinary measures.

On the expenditure side, obligations under pension plans were crushing. For the five fiscal years ending in 2012, Detroit's two pension systems paid out approximately $1.7 *billion* and $1.6 *billion* more than they received in contributions and investment income, which required unsustainable liquidation of pension assets. The city's contribution rates continued to rise significantly. Overall, by 2012 almost 40% revenues were consumed by legacy liabilities, and projections indicated that this percentage would rise to about 65% within five years if unaddressed. As a result, debt service and legacy costs increasingly displaced funding for police, fire, EMS, lighting, and other core municipal services.

b.      <u>Actions Taken</u>. Detroit reduced expenditures wherever it could. It reduced its workforce by 2,700 employees during the two years prior to its filing and implemented reduced employment terms for unrepresented workers and those on expired CBAs. It borrowed $80 million in 2012 alone and deferred approximately $120 million in payments and another $104 million in pension contributions to preserve its dwindling liquidity.

It also entered into a Financial Stability Agreement with the State. This ultimately led to the Governor's appointment of an Emergency Manager for the city in March 2013, who began negotiating with creditor groups. In June 2013, the city presented a comprehensive restructuring proposal to approximately 150 creditor representatives, outlining proposed treatment for various creditor classes and a long-term restructuring framework. Throughout June and July 2013, the city conducted

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

multiple meetings with unions, retiree groups, bond insurers, trustees, and pension representatives to discuss restructuring options and attempt a consensual resolution. Despite these efforts, no comprehensive agreement materialized before the petition date.

### 3. City of Vallejo[6]

a. <u>Challenges Faced</u>. Vallejo entered 2007 showing more than $200 million in cash, of which $137 million was classified as "unrestricted." Unfortunately, a year later, Vallejo projected a $17 million budget deficit. Revenues from sales taxes, real property taxes and license declined as the local and national economies collapsed. Labor expenses alone were projected to exceed revenues the following fiscal year. With no reserves and ongoing deficits, Vallejo was unable to borrow from restricted accounts or private markets, and its financial condition became dire.

b. <u>Actions Taken</u>. Five years before it ultimately filed bankruptcy in 2008, Vallejo began a multi-year effort to cut expenditures, and when its financial situation became critical, it started reducing services. Beginning in 2003, Vallejo eliminated 87 employee positions and significantly cut or eliminated numerous community services, including infrastructure programs. In the 2007-2008 fiscal year, Vallejo reduced about $10 million in funding for programs and services not mandated by contract. In an effort to reduce labor costs, in 2007 Vallejo initiated discussions with collective bargaining units seeking modifications to CBAs, adopted interim CBA modifications to buy time, and later obtained agreement from its various unions on CBA modifications. In

---

[6] For the discussion that follows, see generally *In re City of Vallejo*, 408 B.R 280 (9th Cir. BAP 2009).

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR– Page 17

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

particular, unions representing police and firefighters agreed to significantly lower levels of staffing. Unfortunately, despite negotiations and mediations with the holder of $47 million in municipal bonds during the first six months of 2008, no agreement could be reached. Vallejo filed its chapter 9 case in June 2008.

### 4. The Debtor

a. <u>Challenge Faced</u>. In stark contrast to the numerous and multi-faceted challenges Stockton, Detroit and Vallejo faced, much of which came from external forces over which those cities had little or no control, the Debtor faces a single financial issue that was wholly self-inflicted. The Debtor has not been impacted by extraordinary macro-economic forces. It has no revenue crisis from a declining population; it anticipates significant growth from the future development of two large residential projects. It has no burdens from runaway pension obligations. It has not been faced with the effects of a precipitous decline in property values that would reduce property tax collections. In short, not one of the typical economic pressures cities have struggled to address is present here. Instead, the Debtor's path to bankruptcy was paved solely by way of its willful, serial and comprehensive violations of the DA, and nothing more.

In fact, in prepared remarks delivered at a City Council meeting in January 2025, Councilmember Ken Ratliffe confirmed that the Debtor has *no* financial difficulties – with only one exception:

> In fact, the City of Cle Elum has been managed exceptionally well for the last 40 years or so. . . . The budgets are balanced each and every year. . . . Aside from this remarkable judgment from a single judge, who apparently knows nothing about Cle Elum, the city is in good, no, great shape. This is a fact. Now, Cle Elum is ordered to pay a judgment of 22.3 million, plus interest charged at 12% plus lawyer fees, round figures, 25 million.

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9 DEBTOR– Page 18

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

*See Northrop Declaration,* Exhibit B at 1. The Council then voted to file chapter 9 – in January 2025 – before any collection activity had commenced.

b. <u>Actions Taken</u>.

Again, the Debtor's prepetition efforts here bear no resemblance to the myriad steps Stockton, Detroit and Vallejo took to avoid bankruptcy. These other cities faced challenges coming from multiple directions; the Debtor had but one creditor with which to negotiate. These other cities spent years and undertook numerous austerity measures seeking to address financial challenges that largely were externally created; the Debtor's City Council authorized the filing of chapter 9 less than two months after entry of the Judgment and rejected a proposal that would have made such a filing a last resort (as the law requires). The Debtor made only two payments on the Judgment in the seven months between entry of the Arbitration Award and the filing of this case, totaling $60,000, and refused to make any further payments absent concessions from CHH. To the best of CHH's knowledge, the Debtor did not reduce its workforce, seek to lower wages or benefits, curtail programs, negotiate with its unions for concessions, sell surplus property, or adopt anything that might be remotely akin to an austerity program. It was simply business as usual after entry of the Judgment, virtually nothing was done to avoid this filing, and certainly nothing that would satisfy the good faith obligations that stand as gatekeeping prerequisites to chapter 9 eligibility.

All the Debtor can point to is that it participated in mediation sessions with CHH. But as the Lundh Declaration makes clear, the Debtor never at any time had any notions of accountability or ownership of its financial challenges. And when a settlement was within sight, the Debtor responded by filing this case.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

25-01128-WLH9    Doc 80    Filed 03/02/26    Entered 03/02/26 17:43:08    Pg 19 of 22

**5. Application of Legal Standard**

Having detailed and contrasted the Debtor's prepetition conduct as compared to the challenges and actions of Stockton, Detroit and Vallejo, the elements adopted by the *Stockton* court are easy to apply:

a. Whether the municipality's financial problems are of a nature contemplated by chapter 9. It is inconceivable that Congress intended to provide chapter 9 as a safe harbor for a municipality that solely created its own financial difficulties by way of multiple and comprehensive violations of a development agreement, especially where the municipality had defied two orders to comply prior to incurring the liability it seeks to jettison through a bankruptcy filing.

b. Whether the reasons for filing are consistent with chapter 9. The filing was the product of the Debtor's belief that it could continue to breach the DA with impunity, and its completely passive attitude towards taking steps to address the Judgment and thereby satisfy eligibility prerequisites. Neither is consistent with a remedial statute such as chapter 9.

c. The extent of the municipality's prepetition efforts to address the issues. As detailed above, the Debtor made virtually no efforts before filing to address the financial challenges it had solely created. It simply deemed the damages it caused to be an irrelevant dollar amount that no one would expect it to pay. The contrast between the myriad efforts in *Stockton, Detroit* and *Vallejo* to avoid a filing and the Debtor's non-activity here could not be more stark.

d. The extent that alternatives to chapter 9 were considered. Only the Debtor knows with certainty what alternatives it considered behind the closed doors of

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

jc02p301zg

executive sessions of the City Council. But its threats of a chapter 9 filing and lack of any effort to address the Judgment otherwise supports a finding that it considered no other alternatives.

e. Whether the municipality's residents would be prejudiced by denying chapter 9 relief. This element is unclear here. If chapter 9 relief was properly denied here, the Debtor might then begin to take this matter seriously and formulate a way to genuinely address its circumstances. That seriousness of attitude and intention has not yet been present in the Debtor.

* * *

As detailed above, there is no case in the reported decisions where the municipality both self-created its sole financial difficulty and then took virtually no steps whatsoever to later support a good faith determination. *Stockton, Detroit* and *Vallejo* each provide excellent context as to what factually constitutes good faith in the run-up to a chapter 9 filing. In each case, the city undertook years of efforts to avoid a filing, tapped any and every revenue source available to it, and slashed expenditures wherever possible.

Absolutely none of that occurred here. Rather, the Debtor threatened bankruptcy from the outset, the City Council approved a chapter 9 filing months before negotiations and a mediation process had even begun, and voted down a resolution that would have required that a bankruptcy filing be undertaken only as a last resort. It paid virtually nothing on the judgment and conditioned even the nominal payments it made on some concession from CHH. It never presented even the outline of a proposed plan of adjustment and turned its back on the mediator's efforts to start that process with a

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 21

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

term sheet. And Mayor Lundh ably confirmed the Debtor's ongoing defiance and utter lack of good faith in his description of prepetition events in the Lundh Declaration.

The record is replete with confirmations of the Debtor's arrogance, lack of accountability and lack of good faith prior to the filing of this case. If the gatekeeping elements under section 921(c) mean anything, they need to be enforced here. The case should be dismissed.

DATED this 2nd day of March, 2026.

BUSH KORNFELD LLP


By    /s/ James L. Day
   James L. Day, WSBA #20474
   Jason Wax, WSBA #41944
   *Attorneys for City Heights Holdings, LLC*

OBJECTION OF CITY HEIGHTS HOLDINGS, LLC, TO
CITY OF CLE ELUM'S ELIGIBILITY TO BE CHAPTER 9
DEBTOR– Page 22

jc02p301zg

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104