**Dated: July 14th, 2026**



**Whitman L. Holt**
**Bankruptcy Judge**

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>CITY OF CLE ELUM,<br><br>                Debtor. | Case No. 25-01128-WLH9<br><br><br>**MEMORANDUM OPINION** |

When a city or town's financial stress turns to distress, what should the municipality do?  In some states, the municipality might seek relief under chapter 9 of the Bankruptcy Code.  Yet access to chapter 9 is not unfettered—the municipality must satisfy the eligibility criteria in the Bankruptcy Code, meet any additional criteria imposed by state law, and generally proceed in good faith.

In this case, a large judgment creditor contends that the City of Cle Elum, Washington (the "City") did not file its chapter 9 petition in good faith.  For reasons explained below, the court disagrees.  The court finds and concludes that the City acted in good faith when it sought refuge in bankruptcy and is otherwise eligible to be a chapter 9 debtor.  Accordingly, the court has entered an order for relief and this chapter 9 case should move to the next stage.

### BACKGROUND & PROCEDURAL POSTURE

*General Information About the City*

The City was incorporated in 1902 and is located in Kittitas County, Washington, on the eastern side of the Cascade mountain range.  The City is a small city, with a population of fewer than 2500 people, and it is heavily reliant on tourism and seasonal visitors seeking a broad range of enjoyable outdoor activities.

The City generates revenue through the imposition of taxes (including property and sales taxes), licensing and permitting fees, fines and penalties, and other charges. For 2026, the City budgeted anticipated gross revenues available for its general fund of slightly over $5 million.[1] The 2026 budgeted general fund expenditures are of an identical amount and include, among other expenses, salaries and benefits for City employees (including police, firefighters, cemetery and park staff, librarians, judges, and administrators), equipment and supplies, and certain capital expenditures.[2] Many of the expenditures, such as salaries, are fixed, whereas some significant revenues are subject to variation based on factors outside the City's control. While this phenomenon is true of many government actors,[3] the City's small population and heavy reliance on seasonal visitors may amplify the potential mismatch between its revenues and expenses.

### *The City Heights Litigation and Run-up to Bankruptcy*

In November 2011, the City and City Heights Holdings, LLC ("City Heights") entered into the *City Heights Annexation and Development Agreement* (the "Development Agreement") regarding the development of a master-planned community near the City. The City and City Heights had some significant disagreements about the terms and conditions of the Development Agreement. The parties' disputes were litigated in the context of an arbitration proceeding. The arbitrator ultimately concluded that the City had breached the Development Agreement and in November 2024 entered an arbitration award against the City and in favor of City Heights in the amount of $22,230,175.[4] The arbitration award bears interest at an annual rate of 12%, which means that the debt "would grow by $2,667,621.00 per year and could never be paid from the City's general fund."[5] The arbitration award was subsequently confirmed and reduced to judgment in initial and amended judgments entered by the King County Superior Court on December 9, 2024, and May 12, 2025, respectively. The liquidated judgment debt the City owed as of May 2025 was approximately twenty-six million dollars.

---

[1] *See* ECF No. 116-44 at pp. 6–7 of 59. In addition to its general fund, the City administers numerous other funds that are subject to limited or restricted uses under applicable law.

[2] *See id.* at pp. 14–19 of 59.

[3] For example, so-called "must-pay" expenses generally occupy an increasingly larger percentage of the annual budget for the federal Judiciary and myriad other parts of the federal government.

[4] *See* ECF No. 81 at pp. 7–20 of 46.

[5] ECF No. 98 ¶ 7. *See also* ECF No. 122 at 282:2–9 & 287:16 – 288:8 (Mr. Freeman describing the impossibility of repaying the arbitration award based on the ratio of interest accrual alone to the City's total general fund budget).

**MEMORANDUM OPINION**                    Page 2

Given the impossibility of the City satisfying the entire judgment at once and the challenges the City would face paying even the ongoing interest accrual over time, it was apparent to everyone that some sort of alternative arrangement was necessary to address this debt.[6] Toward that end, principals and professionals for the City and City Heights met in February 2025 to discuss financial projections and options that might allow the parties to reach an agreement about how the City could try to satisfy the City Heights debt.[7]

When informal discussions failed to produce a resolution, the City and City Heights (each of which was and continues to be represented by counsel with significant bankruptcy experience) agreed to engage Alan D. Smith as mediator.[8] The parties participated in three lengthy sessions with the mediator and exchanged numerous emails. The record reflects substantial work by the parties and the mediator, including the preparation of a detailed draft settlement agreement that addressed not only the economic terms of how City Heights would be paid but also myriad complex go-forward issues regarding completion of the development.[9]

In May 2025—while the mediation process was ongoing—City Heights chose to obtain writs of garnishment from the King County Superior Court and then proceeded to enforce those writs by garnishing approximately $465,000 that the City had on deposit with Umpqua Bank and U.S. Bank.

The mediation process did not yield a consensual resolution. This outcome, coupled with City Heights' debt enforcement via garnishment, set the backdrop against which the City chose to file a chapter 9 petition on June 24, 2025.[10]

### Relevant Post-Bankruptcy Events

Following the City's bankruptcy petition, the City and City Heights engaged in further settlement efforts with the assistance of Bankruptcy Judge Benjamin P.

---

[6] *See, e.g.*, ECF No. 104 ¶¶ 2–3 & 8–10 (City Heights principal describing a desire to "resolve the judgment . . . through cooperation, negotiation, and practical solutions, without unnecessary escalation, collection activity, or municipal bankruptcy," such as through what the declarant perceived to be "multiple flexible alternatives").

[7] *See, e.g.*, ECF No. 98 ¶¶ 6–12 (Mr. Freeman describing certain meetings during the first part of 2025).

[8] Mr. Smith is a Seattle attorney with the Perkins Coie law firm who has more than 40 years of experience in bankruptcy and insolvency matters. *See generally* https://perkinscoie.com/professionals/alan-d-smith.

[9] *See* ECF No. 97-22 (emails from Mr. Smith and the draft settlement agreement). *See also generally* ECF No. 97-3 through 97-21; ECF No. 99-1; ECF No. 100 Exs. A–Q (numerous other emails and correspondence between and among counsel for the parties before and during the mediation process).

[10] *See* ECF Nos. 1 & 2.

**MEMORANDUM OPINION**          Page 3

Hursh acting as settlement judge.[11]  When those efforts also did not produce a resolution, the parties concluded that it would be appropriate to litigate whether the City is eligible to be a chapter 9 debtor[12] and City Heights filed an objection arguing that the City failed to commence its bankruptcy case in good faith as required by Bankruptcy Code section 921(c).[13]

Concurrently with the renewed settlement process involving Judge Hursh, the City filed an adversary proceeding against City Heights seeking to avoid and recover the transfers connected with City Heights' writs of garnishment.  City Heights ultimately stipulated and consented to judgment in the adversary proceeding and the court entered an order in the City's favor that avoided the writs and associated liens under Bankruptcy Code sections 544(a), 547(b), and 550(a) while requiring the parties to cooperate in releasing the garnished funds and unfreezing the applicable deposit accounts.[14]  The stipulated judgment is final and the adversary proceeding docket is closed.

The court conducted an evidentiary hearing regarding City Heights' eligibility objection on May 4 and 5, 2026.  At the hearing, the court admitted numerous exhibits and received testimony from five witnesses.[15]  The court requested post-hearing briefing and heard closing argument.  At the conclusion of oral argument, the court overruled City Heights' objection and indicated that it would enter an order for relief under Bankruptcy Code section 921(d).  This opinion further details the bases for the court's oral ruling and order.

## JURISDICTION & POWER

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.).  The parties' dispute regarding the City's

---

[11]    *See* ECF No. 54.

[12]    *See* ECF No. 77.

[13]    *See* ECF No. 80.

[14]    *See City of Cle Elum v. City Heights Holdings, LLC (In re City of Cle Elum)*, Adv. Proc. No. 25-80033-WLH, ECF No. 31 (Bankr. E.D. Wash. Nov. 6, 2025).

[15]    The Mayor of the City, Matthew Lundh, provided live direct, cross, and redirect testimony.  Pursuant to the parties' agreement, the City's other three witnesses provided direct testimony by declaration—*see* ECF Nos. 95 (Annen Decl.), 96 (Carlson Decl.), 98 (Freeman Decl.)—and were subject to live cross and redirect examination.  Pursuant to the parties' agreement, City Heights' witness provided direct testimony by declaration—*see* ECF No. 104 (Northrup Decl.)—and the City chose to forgo the opportunity for cross examination, which meant Mr. Northrup provided no live testimony.  The court generally found each witness who testified live to be sincere and credible in his testimony, although Mr. Carlson was at times unnecessarily combative with counsel.

**MEMORANDUM OPINION**                    Page 4

eligibility for chapter 9 relief is statutorily "core"[16] and "the action at issue stems from the bankruptcy itself."[17]  Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

## DISCUSSION

### *Chapter 9 Bankruptcy Generally*

Chapter 9 is a legal structure permitting the adjustment of debts owed by a municipality.  Congress chose to offer certain municipalities access to powers and benefits provided to other debtors under federal bankruptcy law, including the "breathing spell" of an automatic stay, use of unique financing alternatives, the option to assume or reject certain executory contracts, and the ability to avoid and recover certain transactions.[18]  Like chapter 11 business debtors, chapter 9 debtors can also file a plan of adjustment that binds nonconsenting creditors to the terms of the plan, whether as a result of those creditors being outvoted by the rest of their class or through "cramdown" treatment under the plan.[19]

Congress gave these tools to municipal debtors to achieve what the Collier treatise[20] describes as the purpose of chapter 9:

> to permit a financially distressed public entity to seek protection from its creditors while it formulates and negotiates a plan for adjustment of its debts, either extending maturities, reducing interest or principal, or refinancing its debt by obtaining a new loan elsewhere to pay off existing debt, in whole or in part, and to provide the mechanism by

---

[16] *See* 28 U.S.C. § 157(b)(2)(O); *Int'l Ass'n of Firefighters, Loc. 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 288 (B.A.P. 9th Cir. 2009).

[17] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[18] *See* 11 U.S.C. § 901(a) (incorporating various other parts of the Bankruptcy Code into chapter 9).

[19] *See* 11 U.S.C. §§ 901(a) & 943.

[20] The Collier publication is "a leading treatise on bankruptcy law." *Lamie v. United States Tr*., 540 U.S. 526, 540 (2004).  The court has found the Collier discussion of chapter 9 issues to be particularly clear and insightful and relies extensively on the treatise in this opinion.  In advance of oral argument, the court invited the parties to this case to indicate if they believed any of the legal propositions recited in the treatise are wrong.  *See* ECF No. 130.  At oral argument, counsel for City Heights indicated a disagreement with a single sentence of the Collier chapter regarding Bankruptcy Code section 921.  The court believes the Collier discussion is a reasonable gloss on the cited authority, but out of respect for City Heights' position, the court has not relied on that sentence.

**MEMORANDUM OPINION**                    Page 5

which the plan that is acceptable to the majority of creditors can be made binding on a recalcitrant and dissenting minority.[21]

This description of chapter 9's purpose comports with how the Supreme Court described a predecessor municipal bankruptcy statute roughly 80 years ago[22] and with how the Ninth Circuit Court of Appeals more recently outlined the policies undergirding chapter 9.[23]

Chapter 9 is by design—and perhaps by constitutional mandate[24]—comparatively more favorable for the debtor than other chapters of the Bankruptcy Code.[25] Nevertheless, chapter 9 contains provisions that, in the right context, may offer creditors relief that is unavailable or far more difficult to obtain outside of bankruptcy.[26] For instance, confirmation of a chapter 9 plan binds the municipal debtor to the terms of the plan and subjects the debtor to potential future enforcement of those terms by the federal bankruptcy court.[27] The chapter 9 confirmation process can be used to cement the validity of new debt issued under the plan.[28] And, as one of many aspects of a potential plan-based settlement, a chapter 9 debtor might consent under Bankruptcy Code section 904 to entry of any

---

[21] 6 COLLIER ON BANKRUPTCY ¶ 900.01[1] (16th ed. rev. 2026) (footnote omitted). Citations to Collier in the remainder of this opinion are formatted simply as "Collier ¶ ---."

[22] *See Mason v. Paradise Irr. Dist.*, 326 U.S. 536, 545–46 (1946) (Douglas, J.) (explaining that the purpose of chapter IX of the Bankruptcy Act was "to give this class of debtors a workable and practical method of obtaining relief from oppressive debt burdens" and "to provide [municipal debtors] with a method of scaling down their debt structures and reducing their debt service requirements when the need for relief is shown").

[23] *See Deocampo v. Potts*, 836 F.3d 1134, 1140–41 (9th Cir. 2016).

[24] The Supreme Court in *United States v. Bekins*, 304 U.S. 27 (1938), and *Ashton v. Cameron County Water Dist. No. 1*, 298 U.S. 513 (1936), established the constitutional blueprint for chapter 9 bankruptcy, which requires balancing Congress's plenary power to legislate federal bankruptcy law against Tenth Amendment considerations. These concerns animate several aspects of chapter 9, including the limitations in Bankruptcy Code sections 903 and 904.

[25] The Supreme Court recently observed how "[t]he Bankruptcy Code strikes a balance between the interests of insolvent debtors and their creditors" and explained that the "multiple, often competing interests" calibrated by Congress means that the statute does not "pursue[] a single policy at all costs, and we are not free to rewrite this statute (or any other) as if it did." *Bartenwerfer v. Buckley*, 598 U.S. 69, 72, 81 (2023).

[26] The utility of a uniform municipal insolvency law is underscored by Supreme Court decisions that establish significant limitations on the relief creditors can pursue against distressed municipalities. *See, e.g.*, *Meriwether v. Garrett*, 102 U.S. (12 Otto) 472, 501–02 (1880) (reciting principles that generally limit municipal creditors to repayment through the exercise of legislative taxing power, rather than execution on public property); *id.* at 510–21 (Field, J., concurring) (providing more robust analysis to support the majority opinion).

[27] *See* 11 U.S.C. §§ 944(a) & 945(a).

[28] *See id.* § 944(b)(3).

---

**MEMORANDUM OPINION**  Page 6

further orders as necessary or appropriate to implement or enforce the provisions of the plan, the confirmation order, and any and all related transactions.

Given its power to reshape municipal debt and in light of the constitutional overlay permeating chapter 9, several conditions must be satisfied before a municipal debtor is eligible to proceed under the chapter.[29] The five necessary and sufficient eligibility conditions contained in Bankruptcy Code section 109(c) can be more complex than the conditions applicable to other debtors' access to bankruptcy relief (such as the debt limits that gate entry to chapter 13 and subchapter V of chapter 11). Indeed, in some states, simply completing the analysis under Bankruptcy Code section 109(c)(2)—requiring state authorization of chapter 9 relief due to the constitutional considerations—can be a meaningful task.[30] The putative chapter 9 debtor has the burden of establishing that it is eligible for relief under the chapter, but "[t]his burden should be liberally applied in favor of granting relief" and "the eligibility requirements for relief under chapter 9 should be construed broadly to provide the maximum access to chapter 9 consistent with the constitutional limitations of the Tenth Amendment."[31]

## *Good Faith*

The central dispute before the court is whether the City filed bankruptcy in "good faith." This amorphous phrase is not defined in the Bankruptcy Code. To give content to the phrase, the court considers the purpose and function of the concept in bankruptcy generally and in chapter 9 specifically.

I.     The Role Good Faith Plays in Bankruptcy Generally

As Fifth Circuit Judge Edith Jones cogently explained decades ago:

Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings. Such a standard furthers the balancing process between the interests of debtors

---

[29]   *See* 11 U.S.C. § 109(c).

[30]   *See, e.g.*, *In re Jefferson Cnty.*, 469 B.R. 92 (Bankr. N.D. Ala. 2012) (lengthy opinion analyzing debtor's eligibility under section 109(c)(2), which analysis turned in part on the distinction between "bonds" and "warrants" under Alabama state municipal finance law). The complexities arising in some states are absent in Washington State where the authorizing statutes are effectively unqualified. *See* RCW 39.64.020 & 39.64.040.

[31]   Collier ¶ 900.02[1] (footnotes omitted).

and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with "clean hands."[32]

Principles gatekeeping improper bankruptcies via judicial analysis of a debtor's good faith "must be viewed as direct lineal descendants of a legal philosophy solidly embedded in American bankruptcy law."[33] The exercise's goal is to make sure "that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy."[34]

In addition to the largely uncodified[35] requirement that every bankruptcy petition be filed in good faith, the Bankruptcy Code utilizes the concept of good faith in myriad ways, including for purposes of applying the automatic stay, resolving avoidance actions, protecting counterparties to transactions with the bankruptcy estate representative, and throughout the chapter 11 plan process.[36]

In all these contexts, the bankruptcy court is called to perform a holistic analysis based on the totality of the circumstances.[37] This "analysis should be a

---

[32] *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071–72 (5th Cir. 1986) (citations omitted).

[33] *In re Victory Constr. Co.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981). Bankruptcy Judge Ordin's thoughtful opinion contains a detailed appendix cataloging cases analyzing good faith under the Bankruptcy Act of 1898 and the Chandler Act. *Id.* at 565–70.

[34] *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004). *See also, e.g.*, *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) ("[T]he 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings. Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." (citation omitted)).

[35] In addition to the chapter 9 requirement contained in Bankruptcy Code section 921(c), chapter 13 requires that the court determine whether "the action of the debtor in filing the petition was in good faith" as a statutory element regarding confirmation of a chapter 13 plan. *See* 11 U.S.C. § 1325(a)(7).

[36] *See, e.g.*, *id.* §§ 362(c)(3), 363(m), 364(e), 548(c), 549(c), 550(b), 746(a), 1125(e), 1126(e), 1129(a)(3).

[37] *See, e.g.*, *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1048 (9th Cir. 2013); *Platinum Cap., Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).

**MEMORANDUM OPINION**                    Page 8

fact-intensive examination" that casts the entire context of the specific case before the court against the outer parameters of federal bankruptcy law and appropriate party behavior within those parameters.[38]

### II.  The Particular Role of Good Faith in Chapter 9 Cases

Bankruptcy Code section 921(c) provides that the bankruptcy court "may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."  As noted above, the key phrase "is not defined in the Code and the legislative history of § 921(c) sheds no light on Congress' intent behind the requirement."[39]

Some courts have described section 921(c) as "a sixth essential element for chapter 9 relief in the sense that relief will not be ordered if the case was not filed in good faith."[40]  Nevertheless, as Bankruptcy Judge Christopher Klein persuasively explains, the placement of this element in section 921(c) rather than in section 109(c) and the differing structures of the two parts of the statute require that good faith be analyzed separately and further support a framework in which "if all of the eligibility criteria set forth in § 109(c) . . . are satisfied, it follows that there should be a strong presumption in favor of chapter 9 relief."[41]

In assessing whether a chapter 9 debtor filed bankruptcy in good faith, the court may consider precedent arising from disputes under other chapters, but must not lose sight of how a "bankruptcy of a public entity . . . is very different from that of a private person or concern."[42]  Accordingly, it is appropriate for the court to prioritize "the broader remedial purpose of chapter 9 of providing a mechanism for

---

[38]  *See In re Sisk*, 962 F.3d 1133, 1150 (9th Cir. 2020); *accord Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994) ("'Good faith' and 'reasonableness' are terms that demand fact-intensive, case-by-case analysis, not rigid rules.").

[39]  *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995).

[40]  *In re City of Stockton*, 475 B.R. 720, 725 (Bankr. E.D. Cal. 2012).

[41]  *In re City of Stockton*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013).  *See also* Collier ¶ 921.04[2] ("One court has persuasively reasoned that where a municipality satisfies the requirements of section 109(c), there is a rebuttable presumption of good faith, and concluded that overcoming the presumption is a high burden given the public policy to provide relief for an eligible municipality and the prejudice that could result from dismissal of the case."); *In re City of Chester*, 649 B.R. 633, 661 (Bankr. E.D. Pa. 2023) (applying the same presumption).

[42]  *Newhouse v. Corcoran Irr. Dist.*, 114 F.2d 690, 690–91 (9th Cir. 1940).  *See also, e.g.*, *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) (observing how "many of the principles that apply in the other chapters of the Bankruptcy Code are of limited assistance in construing of Chapter 9").

---

**MEMORANDUM OPINION**          Page 9

the rehabilitation of a municipality" since "chapter 9 may be the only forum for protecting the long-term interests of the municipality and its residents."[43]

The Collier treatise helpfully catalogs seven non-exclusive factors that "may be relevant in a good faith inquiry" under section 921(c):

> (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; (vi) the scope and nature of the debtor's financial problems; and (vii) the public policy in favor of providing relief to an eligible municipality and the potential harm arising from dismissal.[44]

After weighing these factors, any other case-specific considerations, and the overall purpose of chapter 9, the court must determine whether the municipality appropriately sought to deploy the powerful tools available in the Bankruptcy Code. A party seeking to dismiss an otherwise eligible debtor's chapter 9 case has an uphill battle given the presumption in favor of good faith and the precept that "a finding that a municipality did not file in good faith should be reserved for those situations in which the evidence is compelling."[45]

One final point regarding section 921(c) bears note. The plain text of the statute provides that the court "***may*** dismiss the petition," which creates a permissive option rather than a mandatory outcome.[46] Thus, depending on the specific considerations at play in a particular case, a bankruptcy court might exercise its discretion not to dismiss a bad-faith chapter 9 filing if the statutory purposes would be served by allowing the case to proceed.

---

[43] Collier ¶ 921.04[2].

[44] *Id.* (footnotes omitted). *See also, e.g.*, *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 279 (Bankr. S.D.N.Y. 2010) (adopting Collier factors); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (same).

[45] Collier ¶ 921.04[2].

[46] *Id.* ("Indeed, even where evidence exists that a municipality did not file its chapter 9 case in good faith, a court can exercise its discretion and not dismiss the case."). *See also, e.g.*, *Siegel v. Fitzgerald*, 596 U.S. 464, 470–71 & 480 n.2 (2022) (articulating how use of the word "may" in bankruptcy fee statute did not create a requirement, unlike the word "shall"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting statutory use of permissive term "may" with mandatory term "shall"). Other sections of the Bankruptcy Code demonstrate that the choice to make section 921(c) discretionary was intentional as Congress knows how to make dismissal or conversion mandatory when that is the desired result. *See, e.g.*, 11 U.S.C. §§ 1112(b) & 1307(e).

**MEMORANDUM OPINION**          Page 10

**ANALYSIS**

***Primary Ruling – The City Filed Its Petition in Good Faith***

City Heights' objection presents the central question whether the City properly filed a chapter 9 bankruptcy petition. To resolve this question, the court first considers whether the City is an eligible debtor, then canvasses the record established at the evidentiary hearing, and finally addresses City Heights' arguments for dismissal.

I. <u>The City Is Eligible Under Section 109(c), Which Triggers a Presumption of Good Faith</u>

As the putative chapter 9 debtor, the City has the burden of establishing its eligibility under Bankruptcy Code section 109(c), although that burden is a relatively soft one given the welcoming construction that courts apply to facilitate open access to chapter 9.

The City has readily met this burden and City Heights makes no serious argument to the contrary (and provided no evidence to respond to the City's showing). More specifically,

- The City is a municipal entity that is authorized by Washington State to be a chapter 9 debtor pursuant to RCW 39.64.020 & 39.64.040.

- As a result of City Heights' judgment debt, the City is deeply insolvent on both a balance sheet and cash-flow basis, which means the City's financial condition is such that it is unable to pay its debts as they become due, and hence "insolvent" under Bankruptcy Code section 101(32)(C).

- The Mayor's unrebutted testimony establishes that the City desires to effect a plan to adjust its debts, including the City Heights judgment.

- Because the City Heights garnishments resulted in transfers that were actually avoided as preferential transfers during this bankruptcy case, it was reasonable for the City to believe that City Heights ***might attempt*** to obtain a transfer that is avoidable under Bankruptcy Code section 547.

**MEMORANDUM OPINION** Page 11

Because all elements of Bankruptcy Code section 109(c) are established here, the court finds and concludes that the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code. This finding and conclusion in turn gives rise to a strong presumption that the City filed its petition in good faith.

II. <u>The Record Confirms the City's Good Faith</u>

The court has canvassed and considered the entire record established during the evidentiary hearing and all arguments advanced by the parties. After assessing the totality of the circumstances, the court is inexorably led to the conclusion that the City acted in good faith.[47]

Indeed, in the court's view, the fundamental facts are straightforward. The City owes a debt that it cannot pay. The City made serious efforts to negotiate a consensual resolution outside of bankruptcy, but those efforts ultimately were unsuccessful. The City's hand was forced by the collection activity pursued by City Heights during the mediation process as bankruptcy provided a viable tool to undo the effects of the garnishment and protect the City's property pending an exit from chapter 9.[48]

This simple set of facts is sufficient to resolve the good-faith dispute. It is not bad faith for a municipal entity to file bankruptcy when faced with the circumstances described in the preceding paragraph. Indeed, these circumstances flow directly into the factors the Collier treatise outlines as bearing on the analysis under section 921(c); to wit,

(i) the City's subjective beliefs were that it had an untenable debt problem which it attempted to resolve outside of bankruptcy, could not resolve, and was creating imminent practical problems for the City due to the garnishments;

---

[47] The parties disagree about how the ultimate burden should be allocated under section 921(c)—i.e., does the City bear the ultimate burden of proving its good faith or does City Heights bear the ultimate burden of proving the City acted in bad faith? The case law does not cleanly resolve this question and the court declines to weigh in on this issue since the answer would not alter the outcome of the dispute now before the court. Regardless of how the burden should be allocated, the record in this case leads to only one conclusion.

[48] City Heights attempts to mitigate the significance of the garnishments by noting that the City never asked City Heights to release and stop pursuing the garnishments. City Heights cites nothing that would impose such a requirement on the City. And obtaining writs of garnishments in Washington State is no simple feat. In any event, the record demonstrates that the City was quite concerned about the garnishments and promptly brought the matter to the mediator's attention. It is unclear from the record what, if anything, subsequently happened regarding possible resolution of the garnishments.

**MEMORANDUM OPINION**   Page 12

(ii)     the City has severe financial problems creating short- and long-term fiscal challenges for the City, which falls precisely within the situations contemplated by chapter 9;

(iii)    the City filed its chapter 9 petition to address the debt overhang, undo the garnishments as permitted by the Bankruptcy Code, and otherwise holistically resolve matters with City Heights, all of which are goals consistent with the purposes of chapter 9;

(iv)     the City engaged in meaningful, good faith prepetition negotiations with City Heights, including a multi-month mediation process that involved a highly experienced mediator, three in-person sessions, extensive effort by the City and its professionals, exploration of various alternatives, and material concessions proposed by the City[49];

(v)      the City considered alternatives to chapter 9, including the prospect of an out-of-court resolution through the mediation process;

(vi)     the City's financial problems are severe and began causing direct, real-world consequences for the City due to the garnishments; and

(vii)    public policy—including as expressed by Washington State in its open-ended statute authorizing chapter 9 filings—favors providing relief to an eligible municipality such as the City, and the potential harm arising from dismissal is significant insofar as the City would be again left to address the ramifications of the City Heights garnishments and without a clear path to achieve a resolution of the significant judgment debt.

The parties' briefs delve into an array of ancillary sub-issues, arguments, and disputes, but the court believes the overall posture and context of this case is simple and the result is clear. The City faces a major financial problem because of the City Heights judgment, the City meaningfully engaged in an effort to resolve the problem out of court but was unable to do so, and the problem began to have immediate consequences due to the garnishments. These circumstances are

---

[49]   The City's financial advisor testified that he thought the terms offered by the City at the final mediation session were "aggressive" and too risky, and thus he "actually kind of counseled against this concept." *See* ECF No. 122 at 297:3–19.

sufficient to end the analysis and establish the City's good faith in filing a chapter 9 petition.

III.    City Heights' Counterarguments Are Unpersuasive

City Heights relies on several central arguments in contending that the City did not file chapter 9 in good faith.  The court ultimately finds each argument unavailing.

***First***, City Heights makes much of the fact that the City was found by the arbitrator to have breached the Development Agreement.  The court, however, does not believe an adjudicated contractual breach establishes any bad faith by the City.  As an initial matter, the prospect that the City might ultimately file chapter 9 was part of the background law that was incorporated into the Development Agreement.[50]  City Heights is not a tort or other "involuntary" creditor of the City, but instead is a party to a negotiated arrangement that always included the possibility that the City might breach the contract and ultimately exercise its rights under federal bankruptcy law to resolve any resulting judgment.[51]  The fact that this latent possibility became a reality and that the City seeks to use chapter 9 to adjust the contractual debt is not evidence of bad faith by the City.  To the contrary, the impairment, modification, or elimination of prepetition contract rights is one of the overriding functions of a national bankruptcy law.[52]

Similarly, the fact that this bankruptcy is largely a two-party affair between the City and City Heights is not dispositive.  The tools provided by the Bankruptcy Code can appropriately be used to address the consequences of a large judgment.[53]  There is no categorical rule that every bankruptcy case involving two battling

---

[50]    *See, e.g.*, *Farmers & Merchs. Bank v. Fed. Reserve Bank*, 262 U.S. 649, 660 (1923) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms."); *Dopps v. Alderman*, 12 Wn.2d 268, 273 (1942) ("In accordance with a well-established rule, a statute which affects the subject matter of a contract, in contemplation of law, is incorporated into and becomes a part thereof, provided, of course, that the statute is in effect at the time the contract is made.").

[51]    The converse is also true—the City always bore the risk that City Heights could breach its contractual obligations, file bankruptcy, and leave the City holding a general unsecured claim that yields little or no recovery.  Sauce for the goose is sauce for the gander.

[52]    *See, e.g.*, *Bekins*, 304 U.S. at 54; *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902); *Gruntz v. Cnty. of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1080 (9th Cir. 2000) (en banc); *In re City of Stockton*, 526 B.R. 35, 50 (Bankr. E.D. Cal. 2015).

[53]    *See, e.g.*, *In re Marshall*, 721 F.3d at 1046–49; *Kirk v. Texaco, Inc.*, 82 B.R. 678, 679–80 (S.D.N.Y. 1988); *In re King Mt. Tobacco Co.*, 623 B.R. 323, 326 (Bankr. E.D. Wash. 2020).

**MEMORANDUM OPINION**                    Page 14

parties must be dismissed as a bad-faith filing.[54] The City did not file chapter 9 as a litigation tactic against City Heights, in contrast to debtors who file bankruptcy on the eve of trial or to seek to relitigate an adverse prepetition ruling. The litigation was over; City Heights had prevailed. The impetus for this bankruptcy filing was to deal with the fallout of the City's litigated loss to City Heights, which is an entirely proper bankruptcy purpose.

*Second*, City Heights offers no persuasive evidence of any prepetition misconduct, malfeasance, or bad faith by the City. City Heights disagrees with how the City chose to spend some funds, substantive positions the City took about deal points during the mediation, and the tone of emails sent by the City's counsel during the mediation process. By all indications, however, every act taken by the City or its advisors was permitted under Washington law and, in the court's assessment, within the realm of reasonable conduct. In the final analysis, City Heights has not pointed to any prepetition events that would give this court concern that the City was acting in an abusive fashion or that the City sought bankruptcy protection in bad faith.[55]

*Third*, the main authority on which City Heights relies—*In re Sullivan County Regional Refuse Disposal District*[56]—is factually distinguishable and premised on an incorrect view of the law.

*Sullivan County* involved two solid waste districts established under New Hampshire and Vermont law to handle waste disposal.[57] The two entities had entered into a joint venture with a private entity to build and operate an incinerator facility and owed substantial unpaid service fees regarding the facility.[58] The entities filed chapter 9 petitions to address the unpaid fees and the JV counterparty moved to dismiss the cases based on the debtors' asserted lack of good faith.[59]

---

[54]    *See, e.g.*, *In re Stolrow's Inc.*, 84 B.R. 167, 171 (B.A.P. 9th Cir. 1988).

[55]    *Cf. In re City of Chester*, 649 B.R. at 660 (finding "that the record of communications between the City and Preston Hollow . . . support the finding that the City negotiated in good faith with Preston Hollow even though the parties ultimately could not reach a consensual resolution outside of bankruptcy"); *id.* at 661 (explaining that the debtor's good faith was established, in part, because "despite the City's prepetition negotiations with its creditors to avoid a bankruptcy filing, such efforts have not been fruitful and, at this point, Chapter 9 relief appears to be the only viable option to bring all relevant parties to the table in order to reach a resolution and a plan of adjustment").

[56]    165 B.R. 60 (Bankr. D.N.H. 1994).

[57]    *See id.* at 65.

[58]    *See id.*

[59]    *See id.* at 65, 72, 76–80.

**MEMORANDUM OPINION**        Page 15

Bankruptcy Judge James Yacos ultimately concluded that the debtors were ineligible for chapter 9 relief and had not filed petitions in good faith, in large part because each entity had not made a sufficient "effort to use its assessment or taxing powers to meet its obligations before filing" and chapter 9 "was not a final alternative chosen as a last resort."[60]

The factual context of this case is readily distinguishable. Chapter 9 relief is available to two very different sorts of government units: (1) an entire geographical community organized into a political unit, such as a city, town, borough, or county; and (2) a single- or special-purpose district operating within a political unit, such as a waste, health, irrigation, school, or utility district. Although both sorts of governmental units are "municipalities" that might be debtors under chapter 9, the similarities end there. General-purpose governments—such as the City—provide a panoply of services to their residents and have an array of political and economic considerations to weigh and address. Single-purpose districts, by contrast, have far more limited roles, functions, and concerns. The considerations that bear on whether a single-purpose district filed chapter 9 in good faith are likely to be much narrower than the considerations that bear on whether a general-purpose governmental unit filed in good faith. This critical distinction between two species of chapter 9 debtors makes the analysis in *Sullivan County* entirely inapposite here.

The court likewise finds the legal standard emerging from *Sullivan County* unduly constrictive and unsupported in the statute or public policy. Although bankruptcy relief rarely should be anyone's "first resort," there is, and should be, no requirement that bankruptcy always be a "last resort" for highly distressed municipal debtors. The restructuring and discharge of debt through bankruptcy is one of many tools that are legally available to individuals, businesses, and certain municipalities to address their economic problems; there is no legal mandate that anyone relegate the bankruptcy tool to the back of the toolshed. Moreover, the suggestion in *Sullivan County* that a municipal entity must do everything possible to repay creditors outside of bankruptcy—which City Heights then expands to contend some sort of austerity program is required—risks making a bad situation even worse. Stressed and distressed municipalities must remain mindful that if residents dislike economic or social policies adopted by the municipality, people are free to vote with their feet and leave. Perpetually raising taxes or reducing services eventually leads to a tipping point beyond which the municipality risks entering a "death spiral" or becoming a proverbial black hole where population reductions exacerbate economic problems, which in turn lead to more population

---

[60]   *See id.* at 82.

25-01128-WLH9    Doc 143    Filed 07/14/26    Entered 07/14/26 16:13:51    Pg 16 of 19

reductions, and so on.[61]  Navigating this dynamic and avoiding the trap can require delicate and nuanced maneuvering, which a blunt austerity-type requirement may preclude.  Indeed, the City's financial advisor testified at the evidentiary hearing that the City faces some of these very concerns.[62]  To the extent *Sullivan County* or other non-binding cases cited by City Heights impose a stricter standard, the court finds such a standard unsupported by law or policy and hence declines to follow this line of case law.[63]

*     *     *

At day's end, the court does not find the evidence or legal argument offered by City Heights compelling.  City Heights' disagreement with choices made by the City is insufficient to establish that the City acted in bad faith.  The court believes the City's positions, behaviors, and attitudes have been reasonable under the circumstances and, taken as a whole, reveal a good-faith response to an unpayable judgment and a resort to bankruptcy relief only after an unsuccessful mediation and an active effort by City Heights to start collecting on its judgment through transfers that could be (and actually were) avoided by the City in bankruptcy.

### *Alternative Ruling – The Court Exercises Its Discretion Not to Dismiss*

Setting aside the preceding analysis, for the sake of completeness the court has considered whether the City's bankruptcy case should be dismissed **even if** the City filed its petition in bad faith.  After weighing the totality of the record, the court in an exercise of its discretion under section 921(c) finds and concludes that dismissal remains unwarranted.

The situation between the City and City Heights cries out for resolution through a chapter 9 plan of adjustment.  The City is deeply insolvent and must

---

[61]  *See, e.g.*, *In re Pub. Serv. Co. of N.H.*, 114 B.R. 820, 831 (Bankr. D.N.H. 1990) (describing how electricity rates set "too high" can trigger a "death spiral" of diminishing returns following the exodus of customers); Zack A. Clement & R. Andrew Black, *How City Finances Can Be Restructured: Learning from Both Bankruptcy and Contract Impairment Cases*, 88 AM. BANKR. L.J. 41, 43 (2014) ("But there are limits to a city's ability to cut services and raise taxes.  If a city cuts services too much, or if citizens are taxed beyond their capacity, city residents who are able to pay taxes will have an incentive to move to lower tax, higher service suburbs, triggering a depopulating 'death spiral' in that city.").

[62]  *See* ECF No. 122 at 307:18 – 308:16 & 313:12 – 314:5 (Mr. Freeman explaining his views about so-called "amenities" and how some of them are essential things a city should provide or needs to provide to attract and retain a high-quality population who can buy homes, including in development projects).

[63]  *Cf. In re Valley Healthy Sys.*, 383, B.R. 156, 161–63 (Bankr. C.D. Cal. 2008) (rejecting a similarly broad reading of *Sullivan County* in the context of a chapter 9 eligibility dispute).

**MEMORANDUM OPINION**                      Page 17

address the City Heights judgment.  The out-of-court alternatives are not beneficial for any party.  Since the interest accruing on the debt alone outpaces the City's ability to pay, the City faces the prospect of a perpetually negative-amortizing obligation that may remain unpaid for decades.  This effectively puts the City in a situation analogous to what some bankruptcy scholars have called the "sweatbox" for consumer debtors.[64]  This is obviously detrimental for the City, its residents, and others interacting with the City (including visitors and vendors), but it is bad for City Heights, too.  Absent a holistic resolution, City Heights could be left to play an endless game of cat-and-mouse with the City in an effort to locate whatever limited property may be available for debt collection from a governmental unit under applicable nonbankruptcy law.[65]  Chapter 9 breaks the circuit and brings everything to a head for comprehensive resolution.

Indeed, bankruptcy provides a unique crucible in which the parties can negotiate and perhaps develop an expansive consensual resolution that addresses the City Heights debt, the lingering development issues, and any other matters that are appropriately included in a new deal.  As this court has explained elsewhere, "bankruptcy plans are excellent vehicles to motivate and effectuate settlements."[66] Chapter 9—like chapter 11—contains broad and exceptional tools that would permit the City and City Heights to construct myriad mutually beneficial, plan-based settlement frameworks; the parameters framing a zone of possible agreement are broad and indulge the full creativity of the parties and their advisors.[67]

Chapter 9 also includes the prospect of a nonconsensual plan under which City Heights is "crammed down" by the City.  Often the prospect of such a cramdown serves as a strong incentive for a negotiated result.[68]  But not always.

---

[64] *E.g.*, Pamela Foohey, Robert M. Lawless, Katherine Porter & Deborah Thorne, *Life in the Sweatbox*, 94 NOTRE DAME L. REV. 219 (2018).

[65] *Cf.* Timothy E. Steigelman, *Of Admirals and Bondholders*, 45 J. MAR. L. & COM. 1 (2014) (discussing legal aspects of an incident in which a capital markets creditor of the Argentine Republic attempted to seize the tall ship *ARA Libertad* while the vessel was in port at Tema, Ghana).

[66] *In re Easterday Ranches, Inc.*, 647 B.R. 236, 250 (Bankr. E.D. Wash. 2022).

[67] *Cf. In re Claar Cellars LLC*, 2020 Bankr. LEXIS 682, at *10–12, 2020 WL 1238924, at *4–5 (Bankr. E.D. Wash. Mar. 13, 2020) (discussing the array of different deal structures that have been developed under the rubric of Bankruptcy Code section 363(b) and how the possibilities are "bound largely by the needs of specific bankruptcy cases and the creativity of the parties").

[68] *See, e.g.*, *In re Claar Cellars LLC*, 623 B.R. 578, 601 n.49 (Bankr. E.D. Wash. 2021) ("Although it cannot be forced to stand down, the zealous creditor may yet get crammed down, the prospect of which often provides good reason to settle.  Nevertheless, bankruptcy case law and lore are replete with examples where level heads did not prevail and aggressive creditors litigated their way to defeat, often to their regret." (citations omitted)); Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 AM. BANKR. L.J. 663, 695

---

**MEMORANDUM OPINION**  Page 18

To be sure, the City's ability to impose a nonconsensual outcome on City Heights is not limitless; City Heights has whatever rights and arguments a creditor may assert under Bankruptcy Code section 943. Yet the possibility that this case concludes in a nonconsensual fashion ensures that there will be *some* way for the City to resolve what is an otherwise untenable situation. If this case were dismissed, the prospect of a nonconsensual exit evaporates.

In sum, this case is a prime candidate for the successful utilization of the many features chapter 9 offers to municipal debtors and to their creditors. Bankruptcy provides a forum for negotiation, a shadow of rights and risks against which to negotiate, and a legal vehicle to effect a comprehensive adjustment of the City's debts, either consensually or nonconsensually. The end result of the process should benefit the City, its residents, the general public in Washington State, and perhaps even City Heights. These are precisely the ends for which Congress codified chapter 9. Accordingly, it is appropriate for this chapter 9 case to proceed to a final resolution, which means that the court would in all events exercise the discretion Bankruptcy Code section 921(c) affords not to dismiss this case.

## SUMMATION

The City of Cle Elum has an enormous economic problem and chapter 9 bankruptcy provides a solution. In the court's view, the City did everything that a municipality needs to do before filing a chapter 9 petition in Washington State and thus properly sought bankruptcy relief in good faith. Even if the court is wrong in that determination, however, the tools and structure of chapter 9 provide a vehicle to effectively and definitively resolve the broken relationship between the City and City Heights. The court has accordingly entered an order for relief and ruled that this bankruptcy case should proceed onward to the plan stage.

---

(2009) ("Cram down is also a perfect example of how, in altering baselines, bankruptcy law generates and exploits uncertainty which incentivizes and facilitates renegotiation.").